**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
S. Jason Teele, Esq.
Alison E. Kowalski, Esq.
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

-and-

65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-2400 (Facsimile)

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Crownbrook Debco, LLC, *et al.*,[1] | Case No. 10-15245 |
| Debtors. | (Joint Administration Requested) |

**AFFIDAVIT PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**
**AND IN SUPPORT OF THE DEBTORS' PETITIONS AND FIRST DAY MOTIONS**

Ronald Schinik, pursuant to 28 U.S.C. §1746, declares as follows:

1.      I am the manager of Crownbrook Debco, LLC, d/b/a Nicos Polymers Group ("**Crownbrook Debco**"), a New York limited liability company.  I am also the manager of Crownbrook Acquisition I, LLC ("**Crownbrook Acquisition**" and together with Crownbrook Debco, the "**Debtors**").  In these capacities, I have detailed knowledge of and experience with the businesses and financial affairs of the Debtors.

2.      Simultaneously herewith, the Debtors filed voluntary petitions for relief

---

[1]      The Debtors are Crownbrook Debco, LLC and Crownbrook Acquisition I, LLC.

under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.     This Affidavit (the "**Affidavit**") is being submitted (a) pursuant to Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") and (b) in support of the relief requested in the First Day Motions (as defined herein).  Except as otherwise indicated herein, all facts set forth in this Affidavit are based upon my personal knowledge of the Debtors' operations and finances and information gathered from a review of relevant documents, or provided to me by other members of the Debtors' management.

4.     I am authorized to submit this Affidavit on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

5.     Part I of this Affidavit sets forth the information required by Local Rule 1007-2(a) regarding the nature of the Debtors' businesses and a concise statement of the circumstances leading to the commencement of these chapter 11 cases.  Several schedules are attached to this Affidavit, which provide additional information required by Local Rule 1007-2(a).

6.     Part II of this Affidavit describes the "first day" motions (each such motion, a "**First Day Motion**" and, collectively, the "**First Day Motions**")[2] through which the Debtors seek certain forms of relief necessary for a smooth transition to chapter 11.  I have reviewed the relief sought in each First Day Motion and believe the relief requested therein is necessary to enable the Debtors to continue to operate in chapter 11 and to permit the Debtors to successfully reorganize and maintain the value of their assets and businesses.  Accordingly, for the reasons set forth herein, I believe the relief sought in the First Day Motions is in the best interests of the Debtors, their estates, creditors, and other parties in interest in these cases.

---

[2]     Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the relevant First Day Motion.

**PART I**

**NATURE OF THE DEBTORS' BUSINESSES AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

A.      **Nature of the Debtors' Business Operations.**

7.      Crownbrook Debco is an industry leader in recycling and resource recovery in the area of closed loop reclamation of post-industrial plastic.  Crownbrook Debco's services include the acquisition and sale of post-industrial plastic scrap and size reduction services for end-users of plastic scrap, including plastic densification, resin separation, grinding, pulverizing, blending, and extrusion.  Crownbrook Debco engineered multiple processes that provide manufacturers with programs for the recovery and reuse of plastic scrap so that these materials can be reutilized in their own manufacturing processes.

8.      Crownbrook Acquisition is a holding company and the majority member of Crownbrook Debco.  The members of Crownbrook Acquisition are Ronald Schinik, David Krinsky, Fifth Street Mezzanine Partners II, L.P. and Fifth Street Mezzanine Partners III, L.P. Crownbrook Acquisition owns approximately 81.09% of the membership interests of Crownbrook Debco.  The remaining membership interests of Crownbrook Debco are owned by the David Garfinkel 2007 Grantor Trust and JNK2GLD, LLC.

9.      By way of background, in 2007, Crownbrook Debco acquired substantially all of the assets of Debco Plastics, Inc. ("**Debco Plastics**") and Nicos Polymers & Grinding, Inc. ("**Nicos P&G**") in two separate transactions.  In January 2007, Crownbrook Debco entered into an asset purchase agreement with Debco Plastics and its sole shareholder, David Garfinkel, to purchase substantially all of Debco Plastics' assets.  Fifth Street Mezzanine Partners II, L.P. provided a $4.2 million loan to Crownbrook Debco (the "**Debco Plastics Financing**") to finance this transaction.  In connection therewith, Fifth Street Mezzanine Partners II, L.P. received 1.12% of the outstanding equity of Crownbrook Acquisition.

10.      The Debtors' acquisition of Debco Plastics' assets was further financed by the proceeds of a promissory note dated January 17, 2007, between Crownbrook Debco and

Debco Plastics in the aggregate principal amount of $750,000 (the "**Debco Plastics Note**"). As security for the Debco Plastics Note, Crownbrook Acquisition granted Debco Plastics a security interest in certain distributions payable to members of Crownbrook Acquisition on account of Crownbrook Acquisition's membership interests in Crownbrook Debco. The Debco Plastics Note is also secured by a limited personal guarantee of David Krinsky, in the original amount of up to $375,000. As the balance due on the Debco Plastics Note is currently $50,000, Mr. Krinsky's guarantee is also limited to $50,000.

11.     In July 2007, Crownbrook Debco purchased substantially all of the assets of Nicos Polymers & Grinding, Inc. ("**Nicos P&G**"). At that time, Crownbrook Debco sought a new $17.6 million facility with Fifth Street Mezzanine Partners II, L.P. (the "**Fifth Street Facility**") to repay the Debco Plastics Financing and to fund the acquisition of Nicos P&G. The Fifth Street Facility is comprised of: (i) a Term Loan A Note dated July 17, 2007, in the aggregate principal amount of $6,350,000 executed by Crownbrook Debco in favor of Fifth Street Mezzanine Partners II, L.P. (the "**Term Note A**"), and (ii) a Term Loan B Note dated July 17, 2007, in the aggregate principal amount of $11,250,000 executed by Crownbrook Debco in favor of Fifth Street Mezzanine Partners II, L.P. (the "**Term Note B**" and, together with Term Note A, the "**Term Loans**"). The terms of the Fifth Street Facility and the Term Loans are set forth in a credit agreement between Crownbrook Debco and Fifth Street Mezzanine Partners II, L.P. (the "**Credit Agreement**") dated as of July 17, 2007.

12.     Pursuant to a security agreement also dated July 17, 2007 (the "**Security Agreement**"), Fifth Street Mezzanine Partners II, L.P. was granted security interests in and liens upon substantially all of Crownbrook Debco's personal property. Moreover, pursuant to a pledge agreement dated July 17, 2007 (the "**Pledge Agreement**" and, collectively with the Credit Agreement, the Security Agreement and the Term Loans, the "**Fifth Street Prepetition Loan Documents**"), Crownbrook Acquisition pledged its approximately 81.09% membership interest in Crownbrook Debco to Fifth Street Mezzanine II, L.P. as additional collateral for the Term Loans.

13.     Fifth Street Mezzanine Partners II, L.P. has asserted that Fifth Street Mezzanine Partners III, L.P. (together with Fifth Street Mezzanine Partners II, L.P., "**Fifth Street**" and, collectively with Debco Plastics, the "**Secured Creditors**") is an assignee of a portion of the interest of Fifth Street Mezzanine Partners II, L.P. in connection with the Credit Agreement and Security Agreement. [2]

14.     In connection with the Debtors' acquisitions of Debco Plastics and Nicos P&G, Fifth Street acquired 7.75% of the membership interests of Crownbrook Acquisition and 6.3% of the membership interests of Crownbrook Debco.[3] The Debtors therefore believe that Fifth Street is or may be an "insider" as that term is defined in section 101(31) of the Bankruptcy Code, and reserve all rights in respect of Fifth Street's actual or asserted status as an "insider" of the Debtors.

15.     The Nicos P&G acquisition was further financed by a promissory note dated July 17, 2007 between Crownbrook Debco and Nicos P&G in the aggregate principal amount of $3,137,581 (the "**Nicos P&G Note**"). The Nicos P&G Note is subordinate to the Term Loans pursuant to a Debt Subordination Agreement dated July 17, 2007 (the "**Subordination Agreement**").[4]

---

[2]     *See* Notice of Disposition of Collateral dated October 4, 2010. Moreover, the Credit Agreement expressly provides that Fifth Street Mezzanine Partners II, L.P. had the option to sell participation interests in and/or assign all of its interests in the Fifth Street Facility. *See* Credit Agreement, § 8.20 ("The execution by a participant of a participation agreement with [Fifth Street Mezzanine Partners II, L.P], and the execution by [Crownbrook Debco] of this [Credit Agreement], regardless of the order of execution, shall evidence an agreement between [Crownbrook Debco] and said participant. . . "). Likewise, the Security Agreement provides that the agreement would be binding on Fifth Street Mezzanine II, L.P and its successors and assigns. *See* Security Agreement, § 7.1. Fifth Street Mezzanine Partners III, L.P. later merged into Fifth Street Finance Corporation.

[3]     The 7.75% is calculated as follows: (i) Fifth Street Mezzanine Partners II, L.P. received 1.12% of Crownbrook Acquisition in connection with the Debco Plastics Financing; (ii) Fifth Street Mezzanine Partners II, L.P. and Fifth Street Mezzanine Partners III, L.P. each purchased 0.75% of the equity in connection with the Nicos P&G acquisition; and (iii) Fifth Street Mezzanine Partners II, L.P. and Fifth Street Mezzanine Partners III, L.P. each received a 2.57% interest.

**B.      Prepetition Indebtedness and Capital Structure**.

**i.      Secured Indebtedness**

16.      As of the Petition Date, Crownbrook Debco was indebted to Fifth Street in the aggregate amount of approximately $18,331,000 pursuant to the Fifth Street Prepetition Loan Documents.

17.      As of the Petition Date, Crownbrook Debco was indebted to Debco Plastics in the amount of approximately $50,000 pursuant to the Debco Plastics Note.

**ii.      Unsecured Indebtedness**

18.      As of the Petition Date, Crownbrook Debco was indebted to Nicos P&G in the aggregate in the amount of approximately $3,138,582 pursuant to the Nicos P&G Note.

19.      Finally, as of the Petition Date, the Debtors have approximately $482,000 in outstanding obligations to trade and other vendors.

20.      The Debtors' assets have a value as of the Petition Date that is less than the aggregate amount owed to the Secured Creditors.   The aggregate net book value of the Debtors' cash, accounts receivable, inventory, other current assets (*i.e.*, prepaid expenses and deposits) and fixed assets is approximately $4,300,000.

**C.      Events Leading To Debtors' Chapter 11 Filings.**

21.      The general economic downturn reduced the amount of industrial waste available to re-process, and falling oil prices made certain reprocessed plastics less competitive against virgin raw materials.   As a result, Crownbrook Debco's sales decreased precipitously. The Debtors also encountered liquidity issues as a result of increased interest expenses in connection with the Fifth Street Prepetition Loan Documents and the Nicos P&G Note.[5]   The

---

[4]      The Nicos P&G Note was originally in the principal amount of $3.4 million.   After application of certain adjustments provided for in the Nicos P&G Note, the principal amount of that note was reduced to $3,137,581.

[5]      The Fifth Street Prepetition Loan Documents contain covenants that required Crownbrook Debco to maintain specific financial ratios.   Fifth Street declared a default of certain of these covenants, and pursuant to a pair of May 9, 2008 Forbearance and Amendment Agreements dated as of May 29, 2008 (the "**Forbearance Agreements**"), an additional two

combination of the sales decline and liquidity issues has made it difficult for the Debtors to service their obligations to the Secured Lenders and pay certain other obligations as they come due. Subsequent to the execution of the Forbearance Agreements, the Debtors entered into negotiations with Fifth Street with the objective of restructuring the Fifth Street Facility. Thereafter, on October 4, 2010 as the settlement discussions continued, Fifth Street abruptly provided the Debtors with a Notice of Disposition of Collateral, with an auction to sell all of the Debtors' assets scheduled for October 14, 2010. In the days that followed the Debtors continued to seek a resolution to the Fifth Street Facility issues that would be acceptable to all parties in interest, but no resolution was possible.

22. Through these chapter 11 cases, the Debtors intend to rehabilitate their businesses, deleverage their balance sheets and increase liquidity to satisfy the claims of the Secured Creditors, vendors and other creditors under a plan of reorganization that promotes the Debtors' business plan and complies with the applicable provisions of the Bankruptcy Code.

**D.  Other Information Required Pursuant To Local Bankruptcy Rule 1007-2.**

23. Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of my knowledge, information and belief, no committee was formed prior to the order for relief in these chapter 11 cases.

24. Pursuant to Local Bankruptcy Rule 1007-2(a)(4), **Schedule 1** includes a list of the names, addresses and, where available, telephone numbers, of the creditors of the Crownbrook Debco holding the twenty largest unsecured claims, excluding insiders. Such list includes the amount of the claim, the nature of the claim (*i.e.*, trade debt, real property leases, etc.) and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed or partially secured.

25. Pursuant to Local Bankruptcy Rule 1007-2(a)(5), **Schedule 2** includes a

---

percent (2%) interest is accruing on the Debtors' prepetition indebtedness to Fifth Street. In addition, the Nicos P&G Note provides for the payment of an additional six percent (6%) interest because payments of principal are not being made in accordance with the terms of the note.

list of the names and addresses of the Debtors' secured creditors. This list includes the amount of each claim, a brief description and, where available, an estimate of the value of the collateral securing the claim, and whether the claim or lien is contingent, unliquidated or disputed.

26. Pursuant to Local Bankruptcy Rule 1007-2(a)(6), **Schedule 3** includes a summary of the consolidated assets and liabilities of the Debtors. [6]

27. No shares of stock, debentures or other securities of the Debtors are publicly held. Accordingly, I am advised by counsel that Local Bankruptcy Rule 1007-2(a)(7) is inapplicable in these cases.

28. Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of my knowledge, information and belief, the Debtors do not have any property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity.

29. Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the Debtors occupy leased premises at 730 Bangor Road, Nazareth, Pennsylvania pursuant to a Lease Agreement between James J. Knicos and Tara A. Knicos and Crownbrook Debco dated July 17, 2007. The Debtors do not own any real property.

30. Pursuant to Rule 1007-2(a)(10), the location of the Debtors' substantial assets, including furniture, fixtures, equipment, and other personal property is 730 Bangor Road, Nazareth, Pennsylvania. The Debtors' books and records are also located at 730 Bangor Road, Nazareth, Pennsylvania.

31. Pursuant to Rule 1007-2(a)(11), to the best of my knowledge, information and belief, other than these chapter 11 cases, the Debtors are not a party to any pending actions.

32. Pursuant to Rule 1007-2(a)(12), **Schedule 4** includes the names of the individuals who comprise the Debtors' existing senior management, their tenure with the

---

[6] The Debtors review of their books and records is on-going. Information will be supplemented as necessary based on this continuing review.

Debtors, and a brief summary of their relevant responsibilities and experience.

33.     Pursuant to Rule 1007-2(b)(1), the estimated gross amount of payroll obligations to employees of the Debtors (exclusive of officers, directors and members) for the thirty (30) day period following the commencement of the Debtors' chapter 11 cases is approximately $315,576.94.

34.     Pursuant to Rule 1007(b)(2), **Schedule 5** includes the amounts that will be paid to the Debtors' officers, stockholders, members and financial or business consultants for services for the thirty (30) day period following the commencement of the Debtors' chapter 11 cases.

35.     Pursuant to Rule 1007-2(b)(3), **Schedule 6** includes the Debtors' projected 13-week cash flow.

## PART II

## FACTS IN SUPPORT OF FIRST DAY MOTIONS

36.     The Debtors filed the First Day Motions concurrently with the filing of their chapter 11 petitions.  The Debtors request that each of the First Day Motions be granted, as each constitutes a critical element in achieving a successful and smooth transition to chapter 11.

37.     For a more detailed description of the First Day Motions, the Debtors respectfully refer the Court to the respective First Day Motions.  To the extent that this Affidavit and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.

A.      **Debtors' Motion For Interim And Final Orders Under Section 105, 361, 362 And 363 Of The Bankruptcy Code Approving The Use Of Cash Collateral, Providing Adequate Protection And Setting A Final Hearing Pursuant To Bankruptcy Rule 4001 ("Cash Collateral Motion").**

38.     As of the Petition Date, the Debtors were indebted to Fifth Street in the aggregate amount of approximately $18,331,000 pursuant to the Fifth Street Prepetition Loan Documents.  As set forth in the Security Agreement, Fifth Street was granted security interests in

and liens upon substantially all of Crownbrook Debco's personal property. Moreover, pursuant to the Pledge Agreement, Crownbrook Acquisition pledged its approximately 81.09% membership interest in Crownbrook Debco to Fifth Street as additional collateral for the Term Loans.

39.     As of the Petition Date, the Debtors were indebted to Debco Plastics in the amount of approximately $50,000 pursuant to the Debco Plastics Note. The Debco Plastics Note is secured by distributions payable by Crownbrook Debco to Crownbrook Acquisition in respect of its membership interest in Crownbrook Debco and is also personally guaranteed by David Krinsky in the original amount of up to $375,000. As the balance due on the Debco Plastics Note is currently $50,000, Mr. Krinsky's guarantee is also limited to $50,000.

40.     As of the Petition Date, Debtors were indebted, on an unsecured basis, to Nicos P&G in the aggregate in the amount of approximately $3,137,582 pursuant to the Nicos P&G Note. The Nicos P&G Note provided additional funding to finance the Debtor's acquisition of Nicos P&G and is subordinated to the Term Loans by its own terms and pursuant to the Subordination Agreement.

41.     As set forth above, the Debtors' assets have a value as of the Petition Date that is less than the aggregate amount owed to the Secured Creditors.

42.     Without the immediate use of the Secured Creditors' cash collateral (the "**Cash Collateral**"), the Debtors will be unable to pay salaries, rent, utilities and other operating expenses incurred in the ordinary course of business and may be forced to operations and terminate over one hundred (100) employees. Thus, the Debtors' ability to preserve and maximize the value of their assets for all creditors (secured and unsecured) will be critically impaired, and their ability to reorganize, will be substantially jeopardized absent authority to use the Cash Collateral. Accordingly, the Debtors seek the entry of an interim, and subsequently a final, order authorizing the use of the Cash Collateral pursuant to the budget annexed to the Cash Collateral Motion as Exhibit A (the "**Cash Collateral Budget**"). The Cash Collateral Budget is identical to **Schedule 6** to this Affidavit.

43.     Through the use of the Cash Collateral, the Debtors will be able to maintain their operations as going concerns post petition while protecting, preserving and maximizing the value of their assets for all creditors including the Secured Creditors. In order to adequately protect the Secured Creditors' rights, the Debtors propose to grant the Secured Creditors replacement liens on all of the Debtors' post petition assets to the extent of any diminution in the value of the prepetition collateral.[7]

44.     The proposed replacement liens will adequately protect the Secured Creditors within the meaning of section 361 of the Bankruptcy Code and the Debtors submit that they should be authorized to use the Cash Collateral in accordance with the Cash Collateral Budget and as set forth in the Cash Collateral Motion.

**B.     Motion for Interim and Final Orders (A) Authorizing the Debtors to Obtain Post Petition Financing, Grant Security Interests and Lien and Accord Priority Status Pursuant to 11 U.S.C. §§ 361 and 364(c); (B) Giving Notice of Final Hearing Pursuant to Bankruptcy Rule 4001(c)(2); and (C) Modifying Automatic Stay Pursuant to 11 U.S.C. § 362(d) ("DIP Financing Motion")**

45.     The Debtors propose to enter into a $1 million post petition financing arrangement with David Krinsky or his designee (the "**DIP Lender**") on the terms set forth in the Term Sheet and to be set forth in the DIP Loan Documentation, subject to the Cash Collateral Budget (defined in and attached to the Cash Collateral Motion).[8]

46.     As set forth in the Term Sheet, the DIP Loan will include the following provisions:[9]

47.     DIP Facility:     The DIP Lender will commit to make (the "**DIP**

---

[7]     By proposing to grant the Secured Creditors the replacement liens on the Debtors' post petition assets, the Debtors reserve the right to subsequently contest the validity, extent, priority, and/or perfection of the Secured Creditors' liens or seek to avoid them as preferential transfers or assert other potential claims.

[8]     The Debtors and DIP Lender intend to file the DIP Loan Documentation with the Court as expeditiously as possible following the entry of an order approving this Motion on an interim basis.

[9]     This discussion encompasses only the most salient provisions of the Term Sheet.

**Commitment**") debtor in possession term loans in an aggregate principal amount, of approximately $1,000,000, as required per the Cash Collateral Budget, but subject to the terms and conditions set forth in the DIP Loan Documentation (the "**DIP Loan**").

48.     Use of Proceeds:  The DIP Loan will be used for (i) working capital and general limited liability company purposes of the Borrowers and (ii) bankruptcy-related costs and expenses (subject to the Carve-Out (as defined below)), in each case (other than during the period prior to the Definitive Documentation Date) in accordance with a 13-week budget, as such budget shall be updated for subsequent 13-week periods in form and substance acceptable to the DIP Lender no later than four (4) weeks prior to the end of the period covered by the then-existing budget (as so updated and as otherwise amended from time to time with the consent of the DIP Lender, the "**Cash Collateral Budget**").  The initial Cash Collateral Budget shall be provided no later than the Definitive Documentation Date.  Any amendments or modifications to the Cash Collateral Budget then in effect, and each subsequent Cash Collateral Budget, must be consented to in writing by the DIP Lender prior to the implementation thereof.  The DIP Loan shall be funded into a deposit account in the name of the Debtors, but subject to a first-priority security interest in favor of, and under the control of, the DIP Lender and shall be disbursed solely in accordance with the Cash Collateral Budget.

49.     Upon entry of the Interim Order by the Bankruptcy Court and prior to entry of the Final Order, the Borrowers shall be authorized to draw down, and the DIP Lender shall be authorized, but not required, to extend a DIP Loan in an aggregate principal amount of up to $50,000 (the "**Interim Funding**").  Notwithstanding anything to the contrary contained herein, the DIP Lender shall not be obligated to fund any DIP Loans in excess of the Interim Funding unless all conditions precedent have been satisfied, including the entry of a Final Order satisfactory to the DIP Lender and that all judicial proceedings involving the Debtors are satisfactory to the DIP Lender.

50.     None of the proceeds of the DIP Loan shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes

of action, adversary proceedings or other litigation against the DIP Lender (in any capacity), including in connection with the validity of the liens granted to the DIP Lender.

51.    Priority:   The DIP Loan and other liabilities and obligations of the Borrowers to the DIP Lender under the DIP Loan Documentation shall be:

(i)  pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim status in the Case of the Debtors over any and all administrative expenses whether heretofore or hereafter incurred, of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code (but subject to the Carve-Out);

(ii)  pursuant to sections 364(c)(2), secured by a perfected lien on all now owned or hereafter acquired assets of any kind or nature of the Debtors and the proceeds thereof (the "**Collateral**"), to the extent that such Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date;

(iii)  pursuant to section 364(c)(3) of the Bankruptcy Code, secured by a perfected lien on all the Collateral, subordinate and subject to any valid, perfected and non-avoidable liens in favor of third parties as of the Petition Date (including, without limitation, any valid, perfected and non-avoidable liens of Fifth Street Mezzanine Partners II, L.P., Fifth Street Mezzanine Partners III, L.P., and Debco Plastics, Inc. (collectively, the "**Secured Creditors**")) and valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code; and

subject in each case only to permitted exceptions to be agreed upon in writing by the DIP Lender in its sole discretion, and (i) solely following the occurrence of an event of default under the DIP Loan Documentation, the aggregate allowed unpaid fees and expenses payable under sections 330 and 331 of the Bankruptcy Code to professional persons retained pursuant to an order of the Bankruptcy Court by the Debtors and not more than one official statutory committee of unsecured creditors appointed in the Case pursuant to section 1102 of the Bankruptcy Code (provided, that the amount of such fees and expenses included in this clause (i) shall not exceed $350,000 in the aggregate) and (ii) fees pursuant to 28 U.S.C. § 1930 and interest on such fees pursuant to 31 U.S.C. § 3717 to the extent related to the Case, the "**Carve-Out**").

52.    Collateral:   Substantially all now existing and hereafter acquired property of the Borrowers (defined above as the Collateral).

53.    Origination Fee:   A fee (the "**Origination Fee**") equal to (i) 1.00% multiplied by (ii) the full aggregate principal amount of the DIP Commitment, shall be (x) fully earned and non-refundable on the date of entry of the Interim Order and (y) due and payable to the DIP Lender on the Closing Date.

54.    Transaction Fee:   A fee (the "**Transaction Fee**") equal to (i) 2.50%

multiplied by (ii) the full aggregate principal amount of the DIP Commitment, shall be (x) fully earned and non-refundable on the date of entry of the Interim Order and (y) due and payable to the DIP Lender on the Closing Date.

55. <u>Interest Rate</u>: A rate per annum, at the option of the Debtor equal to (i) one-month LIBOR plus five percent (5%) or (ii) the Wall Street Journal prime rate plus 5%, to be paid in kind with such interest added to the principal amount of the DIP Loan monthly in arrears, on the last day of each interest period, with respect to each LIBOR loan, and on the last day of each calendar month, with respect to each prime loan.

56. <u>Maturity Date</u>: The earliest to occur of (i) the one year anniversary of the Closing Date, (ii) ninety (90) days after entry by the Bankruptcy Court of the interim order approving the DIP Loan in the Case (the "**<u>Interim</u> <u>Order</u>**"), if the final order approving the DIP Loan (the "**<u>Final</u> <u>Order</u>**") has not been entered by the Bankruptcy Court in the Case prior to the expiration of such 90-day period, (iii) the effective date of any sale of substantially all of the Borrowers' assets or the confirmation of a plan of reorganization of the Debtors, and (iv) the acceleration of the DIP Loan and the termination of the commitments to make the DIP Loan in accordance with the terms of the DIP Loan Documentation.

57. <u>Financial Covenants</u>: Each of the Borrowers agrees to the following financial covenants: compliance with certain specifically identified line items in the Cash Collateral Budget (provided that variances of percentages to be mutually agreed to in respect of each such line item shall be permitted), reported weekly, and tested weekly. The Definitive Documentation may contain additional financial covenants as reasonably determined by the DIP Lender and reasonably acceptable to the Borrowers.

58. <u>Affirmative Covenants</u>: The DIP Loan Documentation shall contain affirmative covenants customary for debtor-in-possession financings, including, without limitation: (i) delivery of financial statements, reports, projections, budgets, officers' certificates and other information requested by the DIP Lender, including without limitation (a) a quarterly compliance certificate (showing covenant calculations) certified by an authorized financial

officer, to be delivered in conjunction with the quarterly and annual financial statements, (b) weekly updated 13-week cash flow projections, (c) weekly variance reports showing comparisons of actual results for the immediately prior week against the most recent 13-week cash flow projections including such week, and (d) monthly updates to all other projections provided on or before the Closing Date; (ii) access to information (including historical information) and personnel, including, without limitation, regularly scheduled meetings as mutually agreed with senior management and other company advisors and the DIP Lender, and the DIP Lender' financial advisors shall have access to all information they shall reasonably request; (iii) compliance with the Cash Collateral Budget; (iv) delivery of notices of default under the DIP Loan Documentation, litigation and other material events; (v) payment of other obligations of the Borrowers consistent with their terms; (vi) continuation of business and maintenance of existence and material rights and privileges of the Borrowers; (vii) compliance with material contractual obligations of the Borrowers; (viii) maintenance of property and insurance of the Borrowers; (ix) maintenance of books and records of the Borrowers; (x) right of the DIP Lender to inspect property and books and records of the Borrowers; (xi) compliance with laws (including, without limitation, ERISA and environmental laws and regulations); (xii) further assurances (including, without limitation, with respect to security interests in after-acquired property); (xiii) use of proceeds; (xiv) payment of taxes; (xv) maintenance of and adherence to the Borrowers' existing credit and risk control policies; and (xvi) from and after the Definitive Documentation Date, holding of the Borrowers' deposit accounts with respect to deposit accounts holding unused proceeds of the DIP Loan at an acceptable financial institution subject to an account control agreement in favor of the DIP Lender.

59. <u>Negative Covenants</u>: The DIP Loan Documentation shall contain negative covenants customary for debtor-in-possession financings, including, without limitation: (i) limitation on indebtedness, preferred equity interests and contingent obligations relating thereto; (ii) limitation on creating or permitting to exist any liens or encumbrances on any assets, other than liens securing the DIP Loan and any permitted liens and other liens described above;

(iii) limitation on further negative pledges, (iv) limitation on guarantee obligations; (v) limitation on mergers, consolidations, liquidations, dissolutions, acquisitions and non-ordinary course asset sales not approved by the DIP Lender in its sole discretion (such discretion to include the right to approve potential buyers); (vi) limitation on leases; (vii) limitation on dividends, other payment restrictions affecting subsidiaries and other payments in respect of membership interests; (viii) limitation on capital expenditures; (ix) limitation on investments, acquisitions, loans and advances; (x) limitation on optional payments and modifications of subordinated and other debt instruments, (xi) limitation on transactions with affiliates and sale and leasebacks; (xii) limitation on change of fiscal year; (xiii) limitation on changes in business conducted or changes to the organization documents of either Borrower, other than as required by the Bankruptcy Code; (xiv) limitation on any Borrower's ability to assert any right of subrogation or contribution against any other Borrower until all borrowings under the DIP Loan are paid in full and the DIP Lender's commitment is terminated; (xv) prohibition on payment of prepetition claims (other than as approved by the Bankruptcy Court and acceptable to the DIP Lender) and payment of non-budgeted post-petition items; and (xvi) prohibition on consenting to the granting of adequate protection payments or liens, super-priority administrative expense claims or liens having a priority senior or *pari passu* with the liens granted to the DIP Lender, except as otherwise expressly permitted by the DIP Loan Documentation.

      60.   <u>Events of Default</u>: Customary for debtor-in-possession facilities and subject to customary grace periods and cure periods, and materiality thresholds reasonably acceptable to the DIP Lender, including, without limitation: (i) nonpayment of principal when due; (ii) nonpayment of interest, fees or other amounts; (iii) material inaccuracy of representations and warranties; (iv) violation of covenants; (v) cross default; (vi) certain ERISA events; (vii) material judgments; (viii) actual or asserted invalidity of any guarantee or security document, subordination provisions or security interest; (ix) change of control; (x) the filing by Debtors of a Plan that does not provide for payment in full in cash of the DIP Loan and all other amounts owing to the DIP Lender on the effective date of such Plan; (xi) appointment in the

Case of a trustee, receiver, examiner, or responsible officer with enlarged powers relating to the operation of the business of any Borrower (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code); (xii) granting of any other lien with respect to any of the Collateral (other than the Carve-Out and any valid, perfected and non-avoidable liens of the Secured Creditors as of the Petition Date) without the prior consent of the DIP Lender; (xiii) the occurrence of any insolvency, bankruptcy or similar proceeding with respect to any affiliate of the Debtors that is not a debtor in the Case; (xiv) other than payments authorized by the Bankruptcy Court in respect of (a) the Secured Creditors, (b) accrued payroll and related expenses as of the commencement of the Case and (c) certain creditors, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the DIP Lender, or as otherwise permitted under the DIP Loan Documentation, making by the Borrowers of any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition indebtedness or payables; (xv) the entry by the Bankruptcy Court of an order granting relief from the automatic stay to any creditor or party in interest (a) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Borrower, or (b) to permit other actions that would reasonably be expected to have a material adverse effect on the Debtors or their estates; (xvi) any material provision of the DIP Loan Documentation ceasing to be valid or binding on any Borrower, or any Borrower shall so assert in any pleading filed in any court; (xvii) the entry of any order reversing, amending, supplementing, staying for a period in excess of five (5) business days, vacating or otherwise modifying in any material respect the Interim Order or the Final Order without the prior written consent of the DIP Lender; (xviii) the occurrence of a "Change of Executive Management" (the definition of which shall be agreed upon), unless such default is cured to the satisfaction of the DIP Lender within five (5) business days; (xix) failure of the Definitive Documentation Date to occur; (xx) expiration or termination of the exclusive period for the Debtors to file a plan of reorganization under section 1121(b) of the Bankruptcy Code; (xxi) failure of the Final Order to have been entered by the bankruptcy court within 90 days after the Bankruptcy Court's entry of

the Interim Order; (xxii) rendering of any judgments against the Debtors in excess of $25,000 in the aggregate as to any post-petition obligation and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants); or rendering against the Debtors of a nonmonetary judgment with respect to a post-petition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of the Debtors taken as a whole to perform their obligations under the DIP Loan Documentation; (xxiii) any DIP Loan Document ceasing to be effective or being contested by a Borrower or any of its affiliates; (xxiv) failure by any of the Borrowers or their respective affiliates to comply with the Interim Order or Final Order; (xxv) the filing of a motion, pleading or proceeding by the Debtors or their direct or indirect affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment; (xxvi) such other usual and customary Events of Default that are reasonably requested by the DIP Lender, all subject to customary grace periods where appropriate.

61. Upon the occurrence and during the continuance of any Event of Default, the DIP Lender, may take all or any of the following actions without further order of or application to the Bankruptcy Court, provided that, with respect to clause (iii) below and the enforcement of liens or other remedies with respect to the Collateral referred to in clause (iv) below, the DIP Lender shall provide the Borrowers (with a copy to counsel to each statutory committee appointed in the Case, the Secured Creditors and to the United States Trustee) with five (5) business days' prior written notice, and provided further that, upon receipt of any such notice, the Borrowers may make disbursements only in the ordinary course of business consistent with the Cash Collateral Budget and with respect to the Carve-Out, but may not disburse any other amounts; provided further that, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing:

(i) declare the principal of and accrued interest on the outstanding DIP Loan to be immediately due and payable;

(ii) terminate any further commitment to lend to the Borrowers;

(iii) set-off any amounts held as cash collateral (including, without limitation, in any cash collateral account for the benefit of the DIP Lender) or in any accounts maintained by the DIP Lender or its affiliates, subject to any valid, perfected and non-avoidable security interest of the Secured Creditors in such assets; or

(iv) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Lender) permitted under the DIP Loan Documentation or by applicable law;

provided, further, however, that the foregoing remedies shall be subject to any remedies available to the Secured Creditors with respect to assets which are subject to a valid, perfected and non-avoidable security interest of the Secured Creditors.

62.    Costs and Expenses; Indemnification:    All out-of-pocket costs and expenses of the DIP Lender (including, without limitation, fees and disbursements of counsel and of third-party appraisers and consultants advising the DIP Lender, expenses in connection with the appraisal and monitoring of the Collateral, syndication, enforcement of rights and other miscellaneous disbursements) shall be payable by the Borrowers promptly upon written demand (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated; provided, however, that no such costs and expenses shall be due from the Borrowers if the DIP Lender fails or refuses to advance any funds to the Borrowers in violation of the DIP Loan Documentation, or as a result of the Bankruptcy Court's denial of the Debtor's motion to approve the DIP Loan on an interim or final basis.

63.    The Borrowers shall indemnify, pay and hold harmless the DIP Lender (and their respective directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence or willful misconduct of the indemnified party).

64.    Subordination:  For the avoidance of doubt, all liens and security interests granted to the DIP Lender to secure the obligations of the Debtors under the DIP Loan

Documentation in assets which are subject to a valid, perfected and non-avoidable security interest of the Secured Creditors shall be subordinate to such security interests of the Secured Creditors.

65.     The Secured Creditors' rights and security interests are unaffected by the proposed DIP Loan because all liens and security interests granted to the DIP Lender to secure the obligations of the Debtors under the DIP Loan Documentation in assets which are subject to a valid, perfected and non-avoidable security interest of the Secured Creditors shall be subordinate to such security interests of the Secured Creditors.

66.     Upon entry of the Interim Order, the DIP Lender, in its sole and absolute discretion, is prepared to advance up to $1 million to the Debtors. These proceeds will be used to provide the Debtors with sufficient funds to meet their projected obligations during these chapter 11 cases.

**C.     Debtors' Motion For An Order Pursuant To 11 U.S.C. §§ 105 (A) And 507(A)(4) And (5)(I) Authorizing The Debtors To Pay Prepetition Wages And Salaries And Related Taxes And (II) Directing All Banks To Honor Checks For Payment Of Prepetition Employee Obligations ("Wage Motion").**

67.     The Debtors employ approximately 108 employees (the "**Employees**"). The continued and uninterrupted service of the Employees is essential to the Debtors' reorganization. To minimize the personal hardship the Employees will suffer if prepetition employee-related obligations are not paid when due, and to maintain the Employees' morale during this critical time, the Debtors seek authority to (i) pay all prepetition Employee claims for wages, salaries and other accrued compensation and related taxes up to the statutory cap of $11,725 per employee, (ii) make all payments for which Employee payroll deductions were made, (iii) reimburse all prepetition Employee business expenses, (iv) make prepetition contributions and pay benefits under certain employee benefit plans, (v) honor workers' compensation obligations, (vi) pay other miscellaneous, employee-related costs, (vii) continue prepetition programs with respect to vacation, sick, personal and holiday leave and continue

certain health, welfare, savings and other benefit programs as described more fully below (collectively, the "**Employee Obligations**").

68.     The Debtors also (i) request that the Court authorize and direct applicable banks and other financial institutions to receive, process, honor and pay all prepetition checks and transfers drawn on the Debtors' accounts related to the Employee Obligations and (ii) seek authority to pay all processing costs and administrative expenses related to the foregoing payments.

i.     **Summary of Prepetition Employee Obligations**

(a)     **Wages, Salaries and Other Compensation.**

69.     The Debtors pay all Employees on a weekly basis.  The Debtors' average weekly payroll, including associated taxes, is approximately $82,000 (net of employee contributions for medical benefits).  The Debtors use the services of Paychex, Inc. ("**Paychex**") to calculate and issue the Employees' paychecks and direct deposits.  As of the Petition Date, the Debtors outstanding payroll obligations totaled approximately $11,000 (the "**Prepetition Wages**").  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

(b)     **Vacations, Sick, Personal and Holiday Leave.**

70.     In the ordinary course of business, and as is customary with most companies, the Debtors maintain various employee benefit plans and policies for the benefit of their Employees that provide such persons with vacation, holidays, sick time, and similar benefits (collectively, the "**Employee Benefits**").  Employees generally are not entitled to a cash payout for the Employee Benefits.  The Debtors anticipate that their Employees will utilize any accrued Employee Benefits without resulting in any material cash flow requirements beyond the Debtors' normal payroll obligations.  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

**(c)      Insurance Benefits.**

71.      In the ordinary course of their business, the Debtors provide full-time Employees with certain insurance programs including short- and long-term disability, accidental death and dismemberment, medical and health, dental and vision (collectively, the "**Health Benefits**").  The Health Benefits are offered to full-time Employees.  The Debtors' average monthly cost for the Health Benefits is approximately $31,000 before contributions from employees.  As of the Petition Date, the Debtors were current in their Health Benefits obligations.  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

**(d)      Reimbursable Business Expenses.**

72.      Employees may incur a variety of business expenses that are typically reimbursed by the Debtors in the ordinary course of business.  The reimbursable business expenses incurred by Employees include business travel, business meals, car rentals, delivery expenses and related expenses (collectively, the "**Reimbursable Business Expenses**").  All Reimbursable Business Expenses were incurred in the normal course of business and with the understanding that they would be reimbursed by the Debtors.  As of the Petition Date, the Debtors estimate that the Employees collectively incurred unreimbursed expenses aggregating less than $10,000.  The Debtors do not believe that any individual Employee has incurred Reimbursable Business Expenses in excess of $1000.  To the extent any such obligations to any individual Employee exceed $1000, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

**(e)      Workers' Compensation Obligations.**

73.      Under the laws of the jurisdiction in which they operate, the Debtors are required to maintain workers' compensation policies and programs to provide Employees with workers' compensation coverage for claims arising from or related to their employment with the Debtors.    Accordingly, the Debtors maintain workers' compensation insurance in the

Commonwealth of Pennsylvania, pursuant to the applicable requirements of Pennsylvania law.

74.     As of the Petition Date, the Debtors were current in their workers' compensation obligations.  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

ii.     **Other Relief Requested.**

(a)     **Prepetition Processing Costs.**

75.     The Debtors also request authorization to pay various costs incident to maintaining, or paying third parties to maintain and provide record keeping and other administrative services relating to, Employee Benefits that may be outstanding as of the Petition Date (the "**Prepetition Processing Costs**").  By way of example of such Prepetition Processing Costs, the Debtors pay a fee to Paychex in connection with payroll services provided by Paychex.  As of the Petition Date, the Debtors believe they are current in their Prepetition Processing Costs obligations.  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

(b)     **Payroll Taxes and Deductions.**

76.     The Debtors make weekly payments to cover all outstanding tax obligations related to employee and employer payroll taxes.  As of the Petition Date, the Debtors were current with their payroll tax obligations.  To the extent any such obligations are later determined to be due and owing, the Debtors request authority to pay such expenses in the ordinary course of business upon notice to the Office of the United States Trustee.

(c)     **Authority for Banks to Honor and/or Reissue Checks.**

77.     The Debtors further request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all checks and transfers drawn on the Debtors' bank account(s) relating to the Employee Obligations, whether such

checks were presented before, or are presented after, the Petition Date.  Accordingly, the Debtors seek (i) authorization for, and/or ratification of, their banks' honoring of prepetition payroll checks and transfers on or after the Petition Date, (ii) authorization for the banks to process and honor all other checks issued for payments approved in any order granting the Wage Motion, and (iii) authorization to reissue checks for payments approved by this Motion when such checks therefore are dishonored after the Petition Date.

**D.** **Motion For An Order (1) Authorizing The Debtors To (A) Continue and Maintain Their Consolidated Cash Management System, (B) Continue And Maintain Their Existing Bank Accounts And (C) Use Existing Business Forms; (2) Granting Interim Waiver of Section 345 Investment Guidelines; and (3) Granting Related Relief ("Cash Management Motion").**

78.     The Office of the United States Trustee has established certain operating guidelines for debtors in possession.  These guidelines typically require chapter 11 debtors to, among other things, (a) close all existing bank accounts, (b) establish one debtor in possession account for all estate monies required for the payment of taxes, including payroll taxes, (c) maintain a separate debtor in possession account for cash collateral, and (d) obtain checks for all debtor in possession accounts which bear the designation "debtor in possession," the bankruptcy case number, and the type of account.  These requirements are generally designed to provide a clear line of demarcation between prepetition and post petition transactions and operations and to prevent the inadvertent post petition payment of prepetition claims through the payment of checks drawn prior to the filing of a petition.

79.     Prior to the commencement of these chapter 11 cases, as part of their ordinary business practices, the Debtors maintained six bank accounts, a cash management system, business forms and checks.  The Debtors do not have any investment accounts.

80.     As more fully set forth below, to avoid disruption to the ordinary and usual cash management and day-to-day operations of the Debtors, and to ensure an orderly transition into chapter 11, the Debtors respectfully request an order authorizing the Debtors to continue to use their existing bank accounts, cash management system, checks, and business

forms.

81. The Debtors also request that the banks at which the Debtors maintain their existing accounts be entitled to receive payment of both prepetition and post petition service and other fees, costs, charges, and expenses to which such banks may be entitled under the terms of, and in accordance with, their contractual arrangements with the Debtors.

82. Accordingly, through the Cash Management Motion, the Debtors seek entry of an order pursuant to sections 105, 362(a), 363(c)(1), 1107 and 1108 of the Bankruptcy Code:

> (a) authorizing the Debtors, on the terms set forth below, to continue to consolidate the management of their cash without interruption in the ordinary course of business;
>
> (b) directing that the banks at which the Debtors maintain accounts (the "**Cash Management Banks**") are stayed from offsetting, affecting or otherwise impeding the use or transfer of or access to any funds, contained or deposited in the bank accounts, from all bank accounts which are utilized in the Debtors' day-to-day operations (collectively, the "**Accounts**," a list of which is set forth on Exhibit A to the Cash Management Motion) on or subsequent to the commencement of these chapter 11 cases for any reason or on account of any claim (as defined in section 101(5) of the Bankruptcy Code) of the Cash Management Banks;
>
> (c) directing the Cash Management Banks to transfer, in accordance with prepetition practices, or at the request and direction of the Debtors, any funds in the Accounts to the extent set forth herein;
>
> (d) authorizing the Debtors to maintain and continue to use, with the same account numbers, the Accounts maintained with the Cash Management Banks, and directing that all such Accounts be treated for all purposes as Accounts of the Debtors as debtors in possession;
>
> (e) authorizing and directing the Cash Management Banks to service and administer the Accounts without interruption and in the usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on the Accounts, whether presented, drawn or issued before or after the Petition Date for payment by the holders or makers thereof, for any obligations of

the Debtors for which payment is authorized by Court Order, provided that sufficient funds exist, whether deposited prior or subsequent to the commencement of the Debtors' chapter 11 cases, to cover such checks upon presentment;

(f) authorizing the Debtors to use, in their present form, existing checks and other documents, including its existing business forms, relating to the Accounts, provided, however, that the Debtors shall add a "DIP" designation to their existing checks and other business forms; and

(g) granting a waiver of the investment guidelines of section 345 of the Bankruptcy Code.

**i.      Description of the Debtors' Cash Management System.**

83.      Prior to the Petition Date and in the ordinary course of business, the Debtors maintained six (6) bank accounts at Wachovia Bank, N.A. (three (3) accounts), Bank of America, N.A., PNC Bank, N.A. and Lafayette Ambassador Bank.  Receipts from the Debtors' operations are deposited into one of the foregoing accounts.  Funds are then transferred between or from these accounts to pay Employees, vendors and other creditors.

84.      Continuation of the Debtors' Accounts and cash management system is essential to a smooth and orderly transition into chapter 11 and to a successful resolution of these chapter 11 cases.  By permitting the existing accounts to remain open, preserving business continuity, and avoiding the operational and administrative paralysis that closing the accounts and opening new ones would necessarily entail, all parties in interest, including the Debtors' vendors will be best served, and the Debtors' estates will benefit considerably.  Requiring the Debtors to open new accounts would inevitably lead to confusion and delay.

**ii.      The Debtors' Business Forms.**

85.     In the ordinary course of business, the Debtors maintain customary business forms, such as purchase orders, letter head and check stock.  The Debtors seek authority to continue using their existing business forms, including their existing check stock.  A certain amount of time and expense would be required to print and obtain new checks and other forms, which would lead to the wasting of estate assets.  The Debtors will stamp the legend "Debtor In Possession" or "DIP" on substantially all business forms, including all business forms that are ordered after the Petition Date.

### iii.     Compliance with, and Waiver of, Section 345(b) Guidelines

86.     The Debtors do not have any investment accounts.  Moreover, the Debtors' Accounts do not typically have a balance in excess of the level insured by the Federal Deposit Insurance Corporation (the "**FDIC**").  Thus, the Debtors believe that they are in compliance with the depository requirements of section 345 of the Bankruptcy Code.  However, to the extent applicable, the Debtors submit that sufficient cause exists to permit a waiver of the requirements articulated in section 345 of Bankruptcy Code.

87.     Waiver is appropriate in these cases as the Debtors' Accounts are maintained at FDIC-member banks, all of which are financially sound banking institutions.  With the liquidity crisis facing the Debtors and the minimal extent to which any of the Accounts have a balance above the $250,000 insured level, the purpose behind section 345 is not applicable.  Requiring the Debtors to issue bonds in favor of the United States, as the statute requires, would cause substantial unnecessary expense to the estate.

88.     The Debtors submit that granting a waiver of the requirements of section 345 of the Bankruptcy Code will facilitate a smooth and orderly transition of their businesses into chapter 11 and minimize the disruption of this transition.

### E.     Motion for an Order Pursuant to 11 U.S.C. §§ 105(a), 541 and 507(a)(8) Authorizing the Debtors to Pay Prepetition Sales, Franchise and Other Taxes ("<u>Tax</u> <u>Motion</u>").

89.     Through the Tax Motion, the Debtors seek the entry of an Order authorizing them to pay prepetition franchise, withholding and other "trust fund" taxes and

business taxes (collectively, the "**Taxes**") to the respective taxing authorities in the ordinary course of the Debtors' businesses. Such relief will be without prejudice to the Debtors' rights to contest the amounts of any Taxes on any available grounds as of the Petition Date. The Debtors believe that they are current in all of their tax obligations. To the extent any such obligations are later determined to be due and arising, the Debtor request authorization to pay such obligations in the ordinary course of business.

90.     A list of the taxing authorities to whom Taxes may be owed is annexed as Exhibit A to the Tax Motion.

91.     The Debtors submit that many, if not all, of the Taxes likely constitute so-called "trust fund" taxes which are required to be collected from third parties and held in trust for the taxing authorities. To the extent these "trust fund" taxes are collected, they are not property of the Debtors' estates under section 541(d) of the Bankruptcy Code. The Debtors, therefore, arguably have no equitable interest in the Taxes and are obligated to remit payment to the relevant taxing authority.

92.     Even if the Taxes were not "trust fund" taxes, the payments to the taxing authorities should be authorized pursuant to section 105 of the Bankruptcy Code. Without question, the payment of the Taxes to the taxing authorities is necessary here. It is in the best interest of the Debtors' estates that the Taxes be paid on time so as to avoid administrative difficulties. A precautionary withholding of the payment of the Taxes may lead to taxing authorities taking precipitous action, including a marked increase in state audits, a flurry of lien filings, and significant administrative problems. Prompt and regular payment of the Taxes will avoid this unnecessary governmental action.

93.     Moreover, the Taxes are most likely entitled to priority status under section 507(a)(8) of the Bankruptcy Code. The Debtors' payment of the Taxes will thus affect only the timing of the payments and not the amounts to be paid to such entities. Therefore, other creditors and parties in interest will not be prejudiced if the relief sought herein is granted by this

Court, and the Court's exercise of its equitable powers under section 105(a) will not conflict with any other provision in the Bankruptcy Code.

94.     Finally, to the extent the Taxes constitute "trust fund" taxes, officers or members of the Debtors may be held personally liable for the payment of such Taxes.  If accrued Taxes of the Debtors were unpaid as of the Petition Date, the Debtors' members may be unnecessarily subject to lawsuits during the pendency of these proceedings.

95.     Nothing in the Tax Motion or the corresponding order should be construed as impairing the Debtors' ability to contest any Taxes asserted by the various taxing authorities.

**F.     Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 366 for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service on Account of Prepetition Invoices, (II) Deeming Utility Companies To Have Adequate Assurance of Future Payment, and (III) Establishing Procedures For Resolving Requests for Additional Assurance ("<u>Utilities</u> <u>Motion</u>").**

96.     Through the Utilities Motion, the Debtors seek entry of (i) an interim order and (ii) a final order, pursuant to sections 105(a) and 366 of the Bankruptcy Code, (a) prohibiting Utility Companies from discontinuing, altering or refusing service to the Debtors on account of prepetition invoices, (b) deeming Utility Companies to have adequate assurance of future performance on the basis of payment of a security deposit (the "<u>**Utility**</u> <u>**Deposit**</u>") and (c) establishing procedures for resolving requests for additional adequate assurance of future payments.

97.     The Debtors incur utility expenses in the ordinary course of business for, among other things, electricity, telephone/Internet service, and propane.  From and after the Petition Date, the Debtors expect to incur aggregate utility obligations of approximately $56,950.00 per month.  A list of the Utility Companies is attached to the Utilities Motion as Exhibit C.[10]

---

[10]     While the Debtors have exercised reasonable best efforts to list all of their Utility Companies in Exhibit C to the Utilities Motion, it is possible that certain Utility Companies may have been inadvertently omitted from this list.  Accordingly, the Debtors reserve the right, pursuant to the terms and conditions of this Motion and without further order of the Court, to amend Exhibit C to the Utilities Motion to add any omitted Utility Company and to request that

98.     Uninterrupted utility services are essential to the continuation of Debtors' on-going operations and to the success of the Debtors' chapter 11 efforts. The Debtors' operations will be negatively impacted if one or more Utility Company refuses or discontinues utility services for even a brief period of time. Interruption of utility services, to the extent that such interruption limits the Debtors' operations, will damage the Debtors' operations. In addition, interruption of utility services may damage the Debtors' relationships with their customers and will be detrimental to the estates, to all creditors of the Debtors and to the Debtors' employees. Any disruption to the Debtors' operations as a result of the termination of utility services will frustrate the Debtors' reorganization efforts. Thus, it is critical that utility services provided to the Debtors continue uninterrupted.

99.     Section 366 of the Bankruptcy Code prohibits a utility company from altering, refusing or discontinuing its service to a chapter 11 debtor within the first thirty (30) days of the bankruptcy filing (the "**Utilities Stay Period**"). Upon expiration of the Utilities Stay Period, section 366(b) of the Bankruptcy Code provides that a utility company may terminate services if the utility company has not received adequate assurance of payment from the debtor.

100.     In accordance with the definition of adequate assurance of payment under section 366(c)(1)(A) of the Bankruptcy Code, the Debtors propose to provide each Utility Company, as identified on Exhibit C to the Utility Motion, with a Utility Deposit, equivalent to the estimated average value of utility consumption for a two week period, also identified on Exhibit C to the Utility Motion. The Debtors further propose to issue each Utility Deposit within ten (10) business days after the date of entry of the Final Order granting this Motion.

101.     Additionally, the Debtors seek to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the event that a Utility Company believes that the Utility Deposit does not provide them with

the relief set forth in this Motion apply to such entities. In addition, the Debtors reserve the right to argue that any of the entities now or hereafter listed in Exhibit C to the Utility Motion are not "utilities" within the meaning of section 366(a) of the Bankruptcy Code.

satisfactory adequate assurances. The Debtors propose the following procedure:

A. Absent any further order of this Court and except as otherwise provided herein, the Utility Companies may not alter, refuse or discontinue service to, or discriminate against, the Debtors on account of the commencement of these chapter 11 cases or any unpaid prepetition charges, or request payment of an additional deposit or receipt of other security in connection with any unpaid prepetition charges.

B. The Debtors will serve the Motion and the Interim Order, if granted by the Court, on each utility company via first-class mail, within two (2) business days following the entry of the Interim Order. In the event that any Utility Company was omitted from Exhibit C to the Utility Motion, the Debtors shall have the right to supplement Exhibit C and shall promptly provide notice of the Order upon learning of such Utility Company.

C. Any Utility Company may request additional assurance of payment (an "**Additional Payment Request**") within thirty (30) days after the date the Motion is filed (the "**Additional Payment Request Deadline**") by submitting the request to counsel to the Debtors, Lowenstein Sandler PC, 1251 Avenue of the Americas, 18th Floor, New York, New York 10020, Attention: S. Jason Teele, Esq.

D. Any Additional Payment Request must (i) be in writing, (ii) set forth the location for which utility services are provided, (iii) include a summary of the Debtors' payment history relevant to the affected account(s), including any security deposits or other prepayments or assurances previously provided by the Debtors, (iv) describe in sufficient detail the reason(s) why the treatment afforded pursuant to the procedures set forth herein does not constitute satisfactory adequate assurance of payment, and (v) include a proposal for what would constitute adequate assurance from the Debtors, along with an explanation of why such proposal is reasonable.

E. If a Utility Company makes a timely Additional Payment Request that the Debtors believe is reasonable, the Debtors shall be authorized in its sole discretion to comply with such request without further order of the Court.

F. If the Debtors believe that a Utility Company's Additional Payment Request is unreasonable and the parties are unable to agree, the Debtors will schedule a hearing at the next omnibus hearing date scheduled in these cases (a "**Determination**

**Hearing**") to determine adequate assurance to such Utility Company as necessary, or if additional assurance as to payment to such Utility Company is necessary.

G.    Pending resolution of a Utility Company's Additional Payment Request at a Determination Hearing, such Utility Company shall be prohibited from altering, refusing or discontinuing service to the Debtors.

H.    If a Utility Company fails to send an Additional Payment Request by the Additional Payment Request Deadline, such Utility Company shall have waived its right to make an Additional Payment Request and shall be deemed to have received adequate assurance of payment in accordance with §366(c)(1)(A)(vi) by virtue of the Utility Deposit (Utility Companies that do not send Additional Payment Requests to the parties set forth above by the Additional Payment Request Deadline shall be collectively referred to herein as the "**Consenting Utility Companies**").

I.    A Utility Company shall be deemed to have adequate assurance of payment unless and until a future order of this Court is entered requiring further adequate assurance of payment.

102.    The Debtors respectfully submit that this Court should use its equitable powers under section 105(a) of the Bankruptcy Code because the relief requested is necessary to ensure normal operations at the Debtors' facilities as they transition into chapter 11. The Debtors will suffer a severe cash drain if the Utility Companies are permitted to condition post petition services on the payment of exorbitantly burdensome deposits or other extreme forms of adequate protection. The relief sought herein is thus necessary to the extent it prevents a Utility Company from conditioning postpetition utility services on unreasonable demands.

103.    As set forth above, if the Utility Companies are permitted to terminate utility services on the thirty-first day after the Petition Date, a substantial disruption to the Debtors' operations will occur, and the Debtors' businesses will be irreparably harmed. If faced with the imminent termination of utility services, the Debtors may be forced to pay any amount demanded by the Utility Companies to avoid the cessation of essential utility services.

104.    Without the procedures set forth in the Utilities Motion, the Debtors would be forced to address requests by Utility Companies in a haphazard manner at a critical period,

while the Debtors are trying to conduct these chapter 11 cases. The Debtors could be forced to capitulate to almost any demand made by the Utility Companies, or face the discontinuation of utility service to its office and a potential shutdown of its business. The orderly process contemplated by the procedures set forth herein will avert such a potentially disastrous outcome, enabling the Debtors to make a smooth transition into chapter 11, while ensuring a fair process for providing adequate assurance to the Utility Companies to the extent required.

105. Based on the foregoing facts and authorities, the Debtors believe that granting the relief requested in the Utilities Motion will not prejudice the rights of the Utility Companies under section 366 of the Bankruptcy Code.

**G.     Motion for an Order Authorizing Payment of Prepetition Claims of Certain Critical Vendors ("Critical Vendor Motion").**

106. By the Critical Vendor Motion, the Debtors seek entry of an order pursuant to sections 105(a), 363, 364, 1107 and 1108 of the Bankruptcy Code authorizing, but not directing, the Debtors, in their discretion, to pay the prepetition claims of vendors that provided goods and services essential to the operations of the Debtors' business.

107. The Debtors have identified certain vendors that have claims for essential goods and services that were rendered to, or on behalf of, the Debtors before the Petition Date (the "**Critical Vendors**"). A list of the Critical Vendors is attached hereto as **Exhibit A**.[11]

108. The Debtors seek entry of an order authorizing, but not directing, the Debtors, in their discretion, to pay the prepetition claims of the Critical Vendors in an aggregate amount not to exceed $250,000 (the "**Critical Vendor Cap**") and subject to availability under any order of this Court governing the Debtors' use of cash collateral or post-petition financing.

109. The Debtors believe that payment of the prepetition claims of Critical Vendors (the "**Critical Vendor Claims**") is vital to the Debtors' restructuring efforts because

---

[11]     The Debtors reserve the right to amend the list of Critical Vendors, subject to the Critical Vendor Cap, as defined in the Critical Vendor Motion. Given the sensitive nature of the information included in Exhibit A, the Debtors will seek Court authority to file Exhibit A under seal.

without the Critical Vendors, the Debtors' ability to operate their business post-petition could be negatively impacted. Moreover, the failure to pay the Critical Vendor Claims would, in the Debtors' business judgment, result in the Critical Vendors refusing to provide goods and services essential to the Debtors postpetition. In order to maximize the value of the estates for the Debtors' creditors and other stake holders, the Debtors must continue to operate their business with as little interruption as possible. The Debtors submit that this is highly unlikely to occur without payments to the Critical Vendors, who are likely to stop providing essential goods or services unless they are paid on their claims.

110.    The Debtors have developed certain procedures (for which they seek the Court's approval) that, when implemented, will ensure that vendors receiving payment of Critical Vendor Claims will continue to supply the goods and services that are essential to the Debtors' operations on a postpetition basis.

111.    The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of each individual Critical Vendor to continue supplying services to the Debtors on terms that are as (or more) favorable to the Debtors as the most favorable trade terms, practices, and programs in effect between the Critical Vendor and the Debtors in the six months prior to the Petition Date (the "**Customary Trade Terms**"), or such other trade terms as are agreed to by the Debtors and the Critical Vendor. The Debtors reserve the right to negotiate new trade agreements with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

112.    For those Critical Vendors who have agreed to provide goods or services to the Debtors on terms different from their Customary Trade Terms, the Debtors reserve the right to seek written acknowledgment of such terms on a case-by-case basis. Nothing in the Critical Vendor Motion or any order of the Court approving the Critical Vendor Motion should be construed as a waiver by the Debtors of their rights to contest any invoice of a Critical Vendor under applicable non-bankruptcy law.

113.    If a Critical Vendor refuses to supply services to the Debtors on

Customary Trade Terms following payment of any portion of its Critical Vendor Claim, or fails to comply with any trade agreement it entered into with the Debtors, the Debtors seek authority to, in their discretion and without further order of the Court, (i) declare that any trade agreement between the Debtors and such Critical Vendor is terminated (if applicable), and (ii) declare that any payments made to such Critical Vendor on account of its Critical Vendor Claim, whether pursuant to a trade agreement or otherwise, are deemed to have been in payment of then-outstanding postpetition claims of such Critical Vendor.

114. In the event the Debtors exercise either of the rights set forth in the preceding paragraph, the Debtors request that the Critical Vendor against which the Debtors exercise such rights be required to immediately return to the Debtors any payments made on account of its Critical Vendor Claim to the extent that such payments exceed the postpetition amounts then owed to such Critical Vendor, without giving effect to any rights of setoff or reclamation. In essence, the Debtors seek to return the parties to their respective positions immediately prior to entry of an order approving the Critical Vendor Motion in the event a trade agreement is terminated or a Critical Vendor refuses to supply goods or services to the Debtors on Customary Trade Terms or other terms acceptable to the Debtors following payment of any portion of its Critical Vendor Claim.

**H. Motion for an Order Directing Joint Administration of the Debtors' Chapter 11 Cases ("Joint Administration Motion")**

115. Through the Joint Administration Motion, the Debtors seek the joint administration of their chapter 11 cases for procedural purposes only. Specifically, the Debtors request that the Court maintain one file and one docket for each of the jointly-administered cases. The Debtors propose to designate the chapter 11 case of Crownbrook Debco, LLC, d/b/a Nicos Polymers Group, as the main bankruptcy case because Crownbrook Debco is more recognizable to the vast majority of the Debtors' creditors and other parties in interest.

116. The Debtors also request that a docket entry, substantially similar to the following, be entered on the docket of the chapter 11 case of Crownbrook Acquisition I, LLC to

reflect the joint administration of the chapter 11 cases:

> An order has been entered in accordance with Rule 1015(b) of the Federal Rules of Bankruptcy Procedure directing the procedural consolidation and joint administration of the chapter 11 cases of Crownbrook Debco, LLC d/b/a Nicos Poloymers Group ("**Crownbrook Debco**") and Crownbrook Acquisition I, LLC ("**Crownbrook Acquisition**").  All further docket entries shall be made in Case No. ___-_____ (     ).

117.    Finally, the Debtors seek authority to file the monthly operating reports required by the United States Trustee Operating Guidelines on a consolidated basis, provided that separate allocations of disbursements will be made for each Debtor.

118.    I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: October 13, 2010

/s/ *Ronald Schinik*_____
By:  Ronald Schinik
Title:  Managing Partner

# Schedule 1

## Top Twenty Unsecured Creditors
## Crownbrook Debco

| Unsecured Creditors | Contact Information | Phone Number | Amount of Claim |
|---|---|---|---|
| Nicos Polymers & Grinding, Inc. | James Knicos<br>1908 Saucon Lane<br>Bethlehem, PA 18015 | 610-866-2029 | $3,137,581.00 |
| CEI-Cosmetic Essence Inc. | Karen Blevins<br>CEI-Cosmetic Essence Inc.<br>4411 Plantation Road<br>Roanoke, VA 24012 | 540-563-3000 | $48,966.00 |
| McLean Packaging Corporation | Attn: Rosemary<br>McLean Packaging Corporation<br>1504 Glen Ave<br>Moorestown, NJ 08057 | 856-359-2600 | $38,210.00 |
| Canusa Hershman Recycling | Canusa Hershman Recycling<br>9 Business Park Dr. Unit 8|<br>Branford, CT 06405 | 203-488-0887 | $37,416.00 |
| B Braun Medical Inc | B Braun Medical, Inc.<br>P. O. Box 512382<br>Philadelphia, PA 19175-2382 | | $27,049.00 |
| WM Waste Management/Crayola | Kelly Cron<br>WM Waste Management/Crayola<br>910 W. Pennsylvania Avenue<br>Pen Argyl, PA 18072 | 610-863-2383 | $19,500.00 |
| Klockner-Pentaplast Co. | Klockner-Pentaplast Co.<br>PO Box 79709<br>Baltimore, MD 21279-0709 | 540-832-3600 | $18,635.00 |
| PlaxAll Div of Design Center | PlaxAll Div of Design Center<br>5-46 46th Avenue<br>Long Island City, NY 11101-5428 | 718-784-4800 | $15,348.00 |
| New Life Plastic Recylcling, Inc. | New Life Plastic Recycling, Inc.<br>129 W. Trade St.<br>Burlington, NC 27215 | 336-222-7775 | $14,919.45 |
| Veolia ES Technical Solutions | Joann McDonnell<br>Veolia ES Technical Solutions<br>3100 Hedley St.<br>Philadelphia, PA 19137 | 215-537-7338 | $13,374.00 |
| MHI Div of Cosmetic Essence | Attn: Annemarie<br>MHI Div of Cosmetic Essence<br>Dept # 294501<br>P.O. Box 67000<br>Detroit, MI 48267-2945 | 201-462-9280 (x120) | $12,713.00 |
| Rich Energy, Inc. | Rich Energy, Inc.<br>PO Box 711747<br>Cincinnati, OH 45271-1747 | 513-271-1460 | $12,345.00 |

| Unsecured Creditors | Contact Information | Phone Number | Amount of Claim |
|---|---|---|---|
| Indiana Polymers, Inc. | Indiana Polymers, Inc.<br>PO Box 710<br>Portage, IN 46368 | 219-762-9550 | $12,332.00 |
| Polymer Partners, LLC | Polymer Partners, LLC<br>1719 Momentum Place<br>Lockbox #231719<br>Chicago, IL 60689-5317 | 270-869-9000 | $12,330.00 |
| The Hershey Company | Bob Winter<br>The Hershey Company<br>1025 Reese Ave.<br>Hershey, PA 17033 | 717-534-4200 | $12,172.00 |
| American Transport Group, LLC | American Transport Group, LLC<br>75 Remittance Drive, Suite 130<br>Chicago, IL 60675-1300 | 773-328-5113 | $12,095.00 |
| TCS | Attn: Tom<br>TCS<br>177 Mikron Road<br>Bethlehem, PA 18020 | 610-759-3330 | $11,555.00 |
| Package Development | Package Development<br>100 Roundhill Drive<br>Rockaway, NJ 07866 | 973-983-8500 | $11,456.00 |
| International Paper Products | International Paper Products<br>98 SGT TM Dion Way<br>Westfield, MA 01085 | 413-562-3787 | $11,430.00 |
| RPM | RPM<br>RPM 59, rue Commerciale<br>Saint-Damien, QC G0R 2Y0 | 1-888-732-92776 | $11,078.00 |
| **Total** | | | **$3,490,504.45** |

**Schedule 2**

**Secured Lenders**

| Secured Creditor | Amount of Claim | Description | Value of Collateral Securing Claim |
|---|---|---|---|
| Fifth Street Mezzanine Partners, II, L.P. & Fifth Street Mezzanine Partners, III, L.P.<br><br>Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166-4193 | $18,331,000 | The Fifth Street Facility is comprised of: Term Note A and Term Note B as set forth in the Credit Agreement. | Estimated $4.3 million |
| Debco Plastics | $50,000 | Debco Plastics Note Promissory in the aggregate principal amount of $750,00.00 | Estimated $4.3 million |

<u>**Schedule 3**</u>

**Consolidated Assets and Liabilities**

As of October 4, 2010, Reported at Net Book Value

**Assets**

| | |
|---|---:|
| Cash | $666,000 |
| Accounts receivable, net | 1,589,000 |
| Inventory | 348,000 |
| Prepaid expenses | 174,000 |
| Property and equipment, net | 1,378,000 |
| Security deposits | 76,000 |
| Deferred financing fees, net | 123,000 |
| Goodwill, net | 17,590,000 |
| | $$21,944,000.00 |

**Liabilities**

| | |
|---|---:|
| Accounts payable | $482,000 |
| Payroll and payroll related liabilities[12] | 203,000 |
| Accrued management fees | 644,000 |
| Accrued expenses | 70,000 |
| Accrued interest payable | 1,595,000 |
| Deferred rent expense | 70,000 |
| Note and loans payable | 21,523,000 |
| | $24,587,000 |

Note:  Information based on unadjusted books and records as of October 4, 2010.

---

[12]     As of the Petition Date, the Debtors were current with their payroll and payroll related liabilities.

<u>**Schedule 4**</u>

**Debtors' Existing Management**

| Name | Tenure | Title |
|---|---|---|
| Kevin Cronin | 2007 - Present | Chief Executive Officer |
| Ronald Schinik | 2007 - Present | Manager |

Kevin Cronin is currently CEO at Nicos Polymers Group, a private equity owned polymer recycling and resource recovery company located in Nazareth, PA. Prior to joining Nicos, Mr. Cronin was the Vice President and General Manager of Oxford Performance Materials of Enfield, CT, a privately held start-up specialty polymer supplier for implantable medical device and aerospace applications where he was responsible for business systems development and implementation as well as development of new business and strategic sourcing. Mr. Cronin was instrumental in attracting a major European-based chemical company as a strategic investor to lead a new round of funding for the company as well as securing new business with companies such as Boeing and other aerospace tier 1 suppliers. Prior to Oxford, Mr. Cronin was employed for 19 years by Ticona, the engineering resins business of Celanese Chemical Company where he held numerous leadership positions in product development, marketing, sales, e-business and international business management. Accomplishments included; patenting new products, managing and growing large automotive OEM accounts, developing and successfully executing a global, company-wide e-business strategy and leading a fundamental redesign of the marketing function. As an executive-on-loan he co-developed a business plan for and successfully launched an independent 3rd party e-marketplace for plastic resins. His last assignment was as President of Fortron Industries, a joint venture between Ticona and Kureha Chemical Industries of Tokyo, Japan. Mr. Cronin was responsible for reorganizing the company, significantly growing top line sales, retiring all long-term debt and paying the first-ever dividends to the partners of this global business. Mr. Cronin holds a BS in Plastics Engineering from the University of Lowell (University of Massachusetts - Lowell).


Ron Schinik is the co-founder and a principal of CrownBrook Capital LLC, a New York based investment group. Crownbrook Capital LLC acquires majority interests in privately held micro-cap and lower middle market companies with operating cash flow (EBITDA) of $1.5 million to $5 million. Prior to founding CrownBrook Capital LLC Mr. Schinik was the Chief Financial Officer of Quick International Courier ("Quick") an international, non-asset based logistics company specializing in the expedited delivery of time-critical shipments. Mr. Schinik was directly responsible for planning, negotiating, structuring and the integrating Quick's acquisitions, which included transactions in Europe, Canada, United States and the Far East. The acquisition strategy was the primary driver in Quick's emergence as one of the largest privately held companies of its kind with revenues of approaching $150MM at the time of Mr. Schinik's departure. Prior to joining Quick International Courier, Mr. Schinik was a Vice-President of Investment Banking at Rodman & Renshaw, where he was involved in private placements, initial public offerings and secondary offerings with a combined capital raise of approximately $300MM. Before receiving his MBA Mr. Schinik was a Supervising Senior at Richard Eisner and Company, a New York based public accounting firm. As Supervising Senior, he was responsible for leading an audit team on various assignments, which included both privately and

publicly held entities with revenues ranging from $5MM to $250MM.  Mr. Schinik received his BA in accounting form Queens College, the City University of New York and an MBA form New York University Stern School of Business (Finance/International Business/Marketing).  He is a CPA – New York State

## Schedule 5

**Proposed Amounts To Be Paid To The Debtors' Officers, Stockholders, Directors And Financial or Business Consultants For Services For The Thirty-Day Period Following The Commencement of The Debtors' Chapter 11 Cases**

| Name: | Title: | Approx. Amount: |
|---|---|---|
| Kevin Cronin | CEO | $14,307.69 |
| Ronald Schinik | Managing Partner | $18,543.94 |
| **Total:** | | $32,851.63 |

<u>**Schedule 6**</u>

**Debtors' 13-Week Cash Flow Projections**