**WINSTON & STRAWN LLP**
Carey D. Schreiber
Alan Moskowitz
200 Park Avenue
New York, New York 10166-4193
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

*Attorneys for Fifth Street Mezzanine Partners II., L.P.*
*and Fifth Street Finance Corp.*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | |
| CROWNBROOK DEBCO, LLC, | Chapter 11 |
| | Case No. 10-15245 (BRL) |
| Debtor. | |
| | |
| In re: | |
| | |
| CROWNBROOK ACQUISITION I, LLC, | Chapter 11 |
| | Case No. 10-15246 (BRL) |
| Debtor. | |

**MOTION OF FIFTH STREET TO DISMISS THE DEBTORS' CASES, OR**
**ALTERNATIVELY, FOR RELIEF FROM THE AUTOMATIC STAY, OR**
**ALTERNATIVELY, FOR ADEQUATE PROTECTION, AND**
**OMNIBUS OBJECTION TO DEBTORS' MOTIONS FOR USE OF CASH**
**COLLATERAL AND TO OBTAIN DIP FINANCING**

Fifth Street Mezzanine Partners II, L.P. ("FSMP II") and Fifth Street Finance

Corp. ("Fifth Street Finance", together with FSMP II, collectively, "Fifth Street"), as the

prepetition secured lenders to CrownBrook Debco LLC ("CrownBrook Debco"), and together

with CrownBrook Acquisition I LLC ("CrownBrook Acquisition"), the above-captioned debtors

and debtors in possession (collectively, the "Debtors"), hereby submit this Motion for an Order

Dismissing the Debtors' chapter 11 cases, or alternatively, granting relief from the automatic

stay, or alternatively, for adequate protection and omnibus objection (the "Motion to Dismiss")

to (I) the Debtors' Motion for Interim and Final Orders Pursuant to §§ 11 U.S.C. 105, 361, 362

and 363 Approving Use of Cash Collateral, Providing Adequate Protection and Setting a Final

Hearing Pursuant to Bankruptcy Rule 4001 [Docket No. 4] (the "Cash Collateral Motion") and

(II) the Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to Obtain

Post-Petition Financing, Grant Security Interests and Liens and Accord Priority Status Pursuant

to 11 U.S.C. §§ 361 and 364(c); (B) Giving Notice of Final Hearing Pursuant To Bankruptcy

Rule 4001(c)(2); and (C) Modifying Automatic Stay Pursuant To 11 U.S.C. § 362(d) [Docket

No. 5] (the "DIP Motion").  In support hereof, Fifth Street states as follows:

## PRELIMINARY STATEMENT

1.      These chapter 11 cases were filed as a last minute delay tactic in an example of

bad faith by the Debtors' controlling "out of the money" equity holders on the eve of a UCC

Article 9 foreclosure auction scheduled by Fifth Street, to serve no other purpose except to

prevent Fifth Street from exercising its rights after years of Fifth Street forbearing from

exercising remedies upon the occurrence and continuation of multiple, material, events of default

and months of Fifth Street negotiating in good faith towards a consensual out-of-court

restructuring.

2.      At its core, these cases are a two-party dispute between Fifth Street and the

Debtors.  Fifth Street is the Debtors' principal (or only)[1] prepetition secured lender.  The Debtors

owe Fifth Street in excess of $20,300,000 on account of their Prepetition Secured Debt.[2]  The

---

[1]   Upon information and belief, Fifth Street is the Debtors' sole secured creditor.  As set forth below, the
Debtors have no good faith basis to imply, much less assert, that Fifth Street's liens are somehow invalid
and that Fifth Street holds anything other than a first-priority secured lien on all of the Debtors' assets and
Fifth Street reserves all of its rights in this regard.
[2]   As discussed in greater detail below, the Debtors' estimate of the Prepetition Secured Debt (including
in the Schinik Affidavit ¶ 18) as approximately $18,331,000 is materially understated and incorrect.

Prepetition Secured Debt is secured by all of the Debtors' assets. There are no other material creditors who would benefit from the Debtors' restructuring in a bankruptcy proceeding even if one were possible. Fifth Street is undersecured. According to the Debtors, "[t]he aggregate net book value of the Debtors' cash, accounts receivable, inventory, other current assets (*i.e.*, prepaid expenses and deposits) and fixed assets is approximately $4,300,000.00."[3] The Prepetition Secured Debt owing to Fifth Street is nearly FIVE TIMES the Debtors' estimate for the total book value of their assets.

3.    There is approximately $500,000 in general unsecured trade debt, at least half of which the Debtors propose to pay through their critical vendor motion. Thus, there is no possibility that equity will recover anything in these cases. As Fifth Street has advised the Debtors repeatedly, Fifth Street is willing to foreclose on the Collateral, and will continue to operate the business, through which virtually all trade debt will be paid in full.

4.    In addition, the Debtors' own financial projections demonstrate that there is no scenario under which the Debtors could satisfy the Prepetition Secured Debt in the future. The Debtors' cash collateral budget extrapolates to operating cash flow of approximately $2 million on an annualized basis. Since the Petition Date, the Debtors have lost at least one major customer. Putting aside the issue that the extrapolated cash flow number is unrealistic and supportable, even assuming that number were reached, once capital expenditures, taxes, non operating expenses and interest are paid, there would be absolutely no cash with which to pay down the Prepetition Secured Debt.

5.    Fifth Street thus has no equity cushion and equity holders no longer have any interest in this business.

---

[3]    Affidavit of Ronald Schinik Pursuant to Local Bankruptcy Rule 1007-2 and in Support of the Debtors' Petition and First Day Motions dated October 13, 2010 (the "Schinik Affidavit"), ¶ 20.

6.     The Debtors are controlled by David Krinsky (who owns approximately 65% of the membership interests in CrownBrook Acquisition and 52.36% of the membership interests in CrownBrook Debco) and Ronald Schinik (who owns approximately 28% of the membership interests in CrownBrook Acquisition and 22.44% of the membership interests in CrownBrook Debco).  Annual management fees of $360,000 are paid by CrownBrook Debco to CrownBrook Capital LLC, which is, upon information and belief, an entity controlled by Mr. Krinsky.  Mr. Schinik is the Manager of CrownBrook Debco.  The Schinik Affidavit, the Cash Collateral Motion and the DIP Motion are conspicuously silent on all of these points.

7.     By causing the Debtors to file these unplanned chapter 11 cases, the Debtors' out-of-the-money controlling equity holders, Messrs. Krinsky and Schinik, are acting solely in their own pecuniary interests rather than the best interest of creditors.  Although these cases may provide leverage for Messrs. Krinsky and Schinik, these cases provide no benefit whatsoever to the Debtors or their creditors.  There is simply no reason to continue these bankruptcy cases with all of their attendant costs and expenses, operational difficulties and serious financial risks that threaten the going-concern value to the detriment of the Debtors' creditors, employees and other parties-in-interest, especially when a UCC foreclosure sale would best protect Fifth Street. Following the foreclosure sale, Fifth Street intends to operate the assets as a going concern, preserving jobs and allowing for full payment to the minimal undisputed general unsecured trade.  Equity would have an opportunity to bid at the auction for the assets.

8.     In addition, upon information and belief, prior to the Petition Date, Messrs. Krinsky and Schinik, the Debtors' out of the money equity, used in excess of $850,000 of Fifth Street's cash collateral in their quest to further their own personal interests, including causing the Debtors' professionals to receive at least approximately $188,000 in prepetition fees and

4

$350,000 in retainers for application to postpetition fees (amounts representing in excess of 50% of the Debtors' available cash), and using as much as $300,000 to pay an unsecured creditor holding a guarantee from Mr. Krinsky. Having deprived the Debtors of a large portion of their available cash, cash collateral usage is now being sought and Mr. Krinsky is now "magnanimously" offering to provide DIP Financing to the Debtors.

9.     Although the Debtors' motivations for filing these cases should result in the dismissal of these cases, such bad faith, coupled with the lack of adequate protection to Fifth Street, is sufficient cause to lift the automatic stay to permit Fifth Street to foreclose on its Collateral. The Debtors are asking Fifth Street to bear all the risk of these chapter 11 cases and are not providing Fifth Street with any of the standard protections typically included in interim cash collateral orders that would provide Fifth Street with control over the use of its cash collateral and otherwise compensate and protect Fifth Street for such risk. As Fifth Street is already secured by all of the Debtors' assets, the proposed adequate protection (consisting of only replacement liens) is illusory and therefore provides no protection, much less adequate protection. The Debtors have failed to address, much less meet their burden, with respect to their projections (which are at unrealistic, unsupportable levels), including projected collections, projected losses, cash burn, depreciating equipment being utilized, high execution risk, and the inherent uncertainty involved in a chapter 11 case. Simply put, replacement liens on future cash collateral derived from non-existent accounts receivable are speculative at best and thus are not collateral at all.

10.     For the same reasons, the Court should deny the Debtors' request to use cash collateral and enter into debtor-in-possession financing.

11.     In addition, the proposed DIP facility is not fair, reasonable or adequate.  Not only is it a deal with an insider of the Debtors, Mr. Krinsky, but the Debtors failed to seek less expensive and less restrictive financing.  The proposed DIP facility would alter the rights of Fifth Street and provide Mr. Krinsky with overwhelming control over every aspect of these cases at the expense of Fifth Street and in a manner inconsistent with Mr. Krinsky's priority under the Bankruptcy Code.  If the DIP facility were approved, the Debtors would be unable to conduct these cases in accordance with their fiduciary duties to all creditors and maximize value for the benefit of their creditors and, in essence, by seeking approval of the DIP facility, they are asking this Court to bless this breach of fiduciary duty.

12.     In short, the Debtors' principals filed these cases on the eve of the scheduled UCC Article 9 foreclosure sale that would have satisfied virtually all of the general unsecured trade debt, in an attempt to delay the inevitable - the recapitalization of the Debtors in a manner that will provide the best possible recovery to the Debtors secured and general unsecured creditors.  Even worse, Messrs. Krinsky and Schinik seek to finance this detour using Fifth Street's cash collateral and entering into DIP financing while providing no adequate protection other than replacement liens on assets which already constitute Fifth Street's Prepetition Collateral, or by providing debtor in possession financing that provides Mr. Krinsky with greater controls than he should have under the Bankruptcy Code.

13.     No plan of reorganization can be confirmed in these cases that returns value to the Debtors' equity holders without the consent and affirmative vote of Fifth Street.  Fifth Street is not going to agree to that.

14.     The aforementioned deleveraging and restructuring would have occurred had the foreclosure sale proceeded as planned.  But these cases are not about the best interests of the

Debtors' creditors-- they are about a derogation of the fiduciary duty of Messrs. Krinsky and Schinik, the Debtors' management and controlling out of the money equity, to creditors in a futile effort to further their interests as equity holders and to preserve their role as management.

15.     These bankruptcy cases are a thinly-veiled attempt to create hold-up value for out of the money equity holders to the detriment of the true parties in interest, Fifth Street and the Debtors' general unsecured creditors.

16.     Chapter 11 can be a useful vehicle for overleveraged companies where one creditor seeks to exercise remedies in a manner that will allow the creditor to capture value for that creditor that otherwise might be available to other creditors or equity holders through a plan of reorganization.  Such in not the case here, as the Debtors are grossly overleveraged and their own projections show no basis for a confirmable chapter 11 plan.

17.     The best interest of every single party with a true economic stake here demands that these cases be dismissed.

## JURISDICTION

18.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

19.     The statutory predicates for the relief requested herein are sections 1112(b), 361, 362(d)(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 1017, 4001 and 9014.

## BACKGROUND

20.     On October 13, 2010 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors remain in possession of their property and continue to

operate their business as debtors in possession. No trustee or examiner has been appointed in these cases. The Office of the United States Trustee has not yet appointed a committee of unsecured creditors in these chapter 11 cases.

21.     Conspicuously absent from the Schinik Affidavit, Cash Collateral Motion and DIP Motion is any mention that Mr. Krinsky and Mr. Schinik together own approximately 93% of the CrownBrook Acquisition membership interests and 75% of the CrownBrook Debco membership interests[4] and that Mr. Krinsky and, to a lesser degree Mr. Schinik maintain complete control over the management and operations of the Debtors.[5]

22.     CrownBrook Debco is the borrower under that certain Credit Agreement dated as of July 17, 2007 (as amended, supplemented or otherwise modified and in effect from time to time, the "Credit Agreement"), by and among CrownBrook Debco and Fifth Street.[6]

23.     As of the Petition Date, the obligations owing under the Credit Agreement to Fifth Street are in excess of $20.3 million, consisting of $18,708,702[7] in principal, accrued and unpaid cash interest in the amount of approximately $1,500,633, and fees and expenses in excess of $100,000 (the "Prepetition Secured Debt").

24.     As security for the Prepetition Debt, the Debtors granted to Fifth Street a lien on all of the Debtors' assets (all such property, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, the "Prepetition Collateral")

---

[4]  This is based upon CrownBrook Acquisition's ownership of 81.09% of the membership interests in CrownBrook Debco.

[5]  Fifth Street owns a small non-material percentage of membership interests (with no rights or other indicia of ownership, no control, no board seats, no observation rights, etc.) of CrownBrook Acquisition. Fifth Street is simply not an insider of the Debtors, but a lender.

[6]  Pursuant to that certain Assignment and Assumption Agreement dated as of July 17, 2007, FSMP II assigned 50% of its interests and rights in the Prepetition Secured Debt to Fifth Street Mezzanine Partners III, L.P. ("FSMP III"). Pursuant to that certain Agreement and Plan of Merger dated as of January 2, 2008, FSMP III merged with and into Fifth Street Finance.

[7]  $17,225,000 of the principal is for loans advanced to the Debtors and $1,483,702 is PIK interest added to the principal in accordance with the Credit Agreement.

pursuant to that certain Security Agreement, dated as of July 17, 2007 and related documents. These security interests have been perfected by appropriate financing statement filings and, accordingly, Fifth Street has valid, perfected and not otherwise avoidable first-priority security interests on all of Debtors' assets, including the Debtors' cash.

25.     Prior to the Petition Date, for approximately a year, CrownBrook Debco failed to make regularly scheduled principal amortization payments and interest payments on account of the Prepetition Secured Debt.  From mid-2009 to date, CrownBrook Debco has missed $900,000 in principal amortization payments.  The last full interest payment was received by Fifth Street on August 3, 2009 and the last partial interest payment was received by Fifth Street on July 2, 2010.  Thereafter, it appears that although the Debtors continued to pay unsecured subordinated debt that was guaranteed by David Krinsky, without explanation, no payments were made to Fifth Street.

26.     On August 13, 2010, Fifth Street notified CrownBrook Debco of its default on its obligations under the Credit Agreement, including, *inter alia*, its failure to comply with certain financial covenants and failure to make required interest payments.  These defaults remained unremedied, so on September 1, 2010 Fifth Street notified CrownBrook Debco of its acceleration of the Prepetition Secured Debt and the imposition of the default interest rate set forth in the Credit Agreement.  On September 8, 2010, Fifth Street again demanded payment in full of the Prepetition Secured Debt.

27.     On October 4, 2010, after Fifth Street's proposals for a consensual balance sheet restructuring that would have paid virtually all of the Debtors' general unsecured trade in full through the continued operation of the Debtors' businesses were repeatedly rebuffed, Fifth Street served the Debtors and all other parties required to receive notice with a Notification of

Disposition of Collateral in compliance with the New York Uniform Commercial Code, to sell the assets of CrownBrook Debco at a public auction that was scheduled to be held on October 14, 2010.

28.     The Debtors filed their petitions on the eve of the auction triggering an automatic stay of the auction. The Debtors failed to engage Fifth Street in any discussion about the particulars of the chapter 11 filings before they occurred choosing instead to taking precipitous action and not to provide Fifth Street with a proposed cash collateral order, a budget for the use of cash collateral, forms of "first day" pleadings and the like. Indeed, to date, other than a minimal amount of information provided for immediate cash collateral usage, the Debtors have failed, despite repeated requests, to provide any material support for their requested use of cash collateral as set forth in the proposed budget over the timeframe proposed. It is unclear how much of Fifth Street's cash collateral has been provided to the Debtors' professionals for application to postpetition fees and how much cash collateral was used prior to the filing by the Debtors' out of the money equity that did not benefit the Debtors' creditors, but, upon information and belief, it is in excess of $850,000.

## ARGUMENT

### I.      The Debtors' Chapter 11 Cases Should Be Dismissed for Cause

29.     Section 1112(b) of the Bankruptcy Code provides that the court (absent unusual circumstances) <u>shall</u> dismiss a chapter 11 case upon a showing of cause by a party in interest.[8] While "cause" is not specifically defined, section 1112(b)(4) of the Bankruptcy Code sets forth a

---

[8] "[O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested . . . dismissal is not in the best interests of the creditors and the estate, the court <u>shall</u> . . . dismiss a case under this chapter . . . if the movant establishes cause." 11 U.S.C. § 1112(b) (emphasis added).

non-exclusive list of sixteen examples of cause for dismissal, including a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A); see In re Gen. Growth Props., Inc., 409 B.R. 43, 55 (Bankr. S.D.N.Y. 2009); see also In re Adler, 329 B.R. 406, 409 (Bankr. S.D.N.Y, 2005); Quarles v. U.S. Trustee, 194 B.R. 94, 96 (W.D. Va, 1996) ("The factors in § 1112(b) [of the Bankruptcy Code] are non-exclusive, and a bankruptcy court may consider additional grounds in determining 'cause.'").

30.     Each of the general categories of cause enumerated in section 1112(b) of the Bankruptcy Code "involves a situation in which it is typically unlikely that the benefits of reorganization will be achieved within a reasonable amount of time or at an acceptable cost." 7 Collier on Bankruptcy 1112.04[3] (15th ed. 2007). "In other words, each category defines in generic terms the general circumstances in which it is typically unreasonable for the chapter 11 process to proceed." Id.

### a. The Cases Were Filed By The Debtors In Bad Faith

31.     Filing a petition in bad faith provides the requisite "cause" under section 1112(b) of the Bankruptcy Code to dismiss a chapter 11 petition. See C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship, 113 F.3d 1304, 1309 (2d Cir. 1997) ("[W]hen it is clear that, from the date of filing, the debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing, then the Chapter 11 petition may be frivolous"); see also Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.), 931 F.2d 222 (2d Cir. 1991). The Second Circuit applies a two-prong test to determine whether to dismiss a case: "if **both** objective futility of the reorganization process **and** subjective bad faith in filing the petition are found." In re Kingston Square Assocs., 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997) (emphasis in original). To satisfy the objective prong, "the movant must

demonstrate the objective futility of the reorganization process such that at the time of filing there was no reasonable probability that [the debtor] would eventually emerge from bankruptcy proceedings." Squires Motel, LLC v. Gance, 426 B.R. 29, 34 (N.D.N.Y. 2010) (internal quotes omitted). To establish subjective bad faith, "the movant must show that there was no reasonable likelihood that the debtor intended to reorganize." Id. (internal quotes omitted).

32. In determining whether good faith exists, courts look to all the surrounding facts of the case, employing a "totality of the circumstances" test rather than any single factor. See In re Kingston Square Assocs., 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997); In re Fraternal Composite Servs., Inc., 315 B.R. 247, 249 (Bankr. N.D.N.Y. 2003). Although analyzing whether a chapter 11 was filed in bad faith requires a "highly factual determination," it is also "one that may sweep broadly." In re C-TC 9th Ave. P'ship 113 F.3d at 1312.

33. In In re C-TC 9th Ave. P'ship, the court outlined the following factors to consider as particularly indicative of a bad faith filing:

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

113 F.3d at 1311; see also Squires Motel, LLC v. Gance, 426 B.R. 29, 35 (N.D.N.Y. 2010); In re Phoenix Piccadilly, LTD., 849 F.2d 1393, 1394-95 (11th Cir. 1988).

34. At its core, these cases are nothing more than a two-party dispute between Debtors and Fifth Street, arising from on the Debtors' inability to repay Fifth Street in excess of

$20,300,000 on account of their Prepetition Secured Debt. Fifth Street is secured by all of the Debtors' assets and has sought to foreclose on substantially all of the assets in order to operate the Debtors' business going forward. The Debtors have limited cash flow, and cannot meet their current expenses without extraordinary relief from the Court.

35. This two-party dispute can be easily resolved, with little expense and without the risks attendant to a chapter 11 filing, in the pending UCC Article 9 foreclosure proceeding that resulted from the Debtors' continuous and ongoing default on the Prepetition Secured Debt. Additionally, as described above, the Debtors have few unsecured trade creditors (owed a total of approximately $500,000 or approximately 1/40th of the amount of the Prepetition Secured Debt) and trade creditors will likely in any event be satisfied in the ordinary course of business after the foreclosure as the business continues to operate.

36. Additionally, the timing of Debtors' filings – on the eve of the UCC foreclosure auction, which was scheduled by Fifth Street after years of Fifth Street forbearing from exercising remedies upon the occurrence and continuation of multiple, material, events of default and many months in which Fifth Street negotiated in good faith towards a consensual out-of-court restructuring – clearly evidences an intent to delay or frustrate the legitimate efforts of Fifth Street to enforce its rights. The sole purpose of these chapter 11 filings appears to be to forestall Fifth Street's inevitable exercise of its rights as a secured creditor in all of the Debtors' assets and to protect the Debtors' insiders.

### b. The Debtors' Chapter 11 Cases Will Diminish The Debtors' Estates And Provide No Path to Rehabilitation

37. The Debtors' chapter 11 cases have resulted in substantial harm to the Debtors and will continue to cause loss to the Debtors' estates until they are dismissed. As a result of these chapter 11 filings, the Debtors are subject to all of the costs, expenses and risks associated

with a bankruptcy. For example, in bankruptcy, the Debtors are subject to statutorily imposed U.S. Trustee's fees, and, if approved, the fees and expenses incurred by the Debtors' professionals and any professionals retained by any official committee of unsecured creditors. See 28 U.S. C. § 1930(a)(6); 11 U.S.C. § 330. The Debtors are also restricted in terms of using property out of the ordinary course of business. See 11 U.S.C. § 363.

38. However, there is no benefit to the Debtors' creditors by this filing. There is minimal unsecured trade debt that was generally being paid on a timely basis. Employees were being paid on a timely basis. As set forth herein, these chapter 11 cases were filed at the behest of Messrs. Krinsky and Schinik in an effort to stop Fifth Street's foreclosure of the assets and to try to obtain a strategic advantage in this regard. If the cases are dismissed, Fifth Street will foreclose on the assets and continue operating in the normal course of business.

39. As cause exists, Fifth Street respectfully requests that this Court enter an order dismissing Debtors' chapter 11 bankruptcy cases.

## II. <u>Alternatively, Fifth Street Is Entitled To Relief From The Automatic Stay</u>

40. Alternatively, cause exists under section 362(d)(1) of the Bankruptcy Code to justify granting Fifth Street relief from the automatic stay to proceed with the Article 9 UCC foreclosure auction because (1) the Debtors' chapter 11 was filed in bad faith, and (2) Fifth Street is not being and cannot be adequately protected and the Debtors are unable to reorganize in chapter 11.

### a. Fifth Street Is Entitled To Relief From Stay Based Upon The Debtors' Bad Faith Filing

41. The list of grounds for relief from the automatic stay provided by section 362(d)(1) of the Bankruptcy Code is illustrative and by no means exhaustive. See In re Eclair Bakery LTD., 255 B.R. 121, 137 (Bankr. S.D.N.Y. 2000). It is well-settled that "cause" for

relief from stay may be found based on bad faith filing.  Id. at 137-38.  Courts granting relief

from the automatic stay for cause on the grounds of a bad faith filing have used the same criteria

as the ones for dismissal enumerated in In re C-TC 9th Ave. P'ship.  See In re 234-6 West 22nd

St. Corp., 214 B.R. 751 (Bankr. S.D.N.Y. 1997) ("[I]n the context of a motion either to dismiss a

chapter 11 case under § 1112(b) or to lift the stay under § 362(d)(1) the standards for bad faith as

evidence of cause are not substantively different from each other . . . .") (internal citations

omitted); see also In re Laguna Assocs. Ltd. Partnership, 30 F.3d 734 (6th Cir. 1994).  Thus, a

petition filed in bad faith is sufficient grounds for granting relief from the automatic stay.

42.     As demonstrated above, these chapter 11 cases were filed in bad faith

constituting sufficient cause pursuant to section 362(d)(1) of the Bankruptcy Code and under the

standards set by applicable Second Circuit case law.

**b.   Relief From Stay Should Be Granted Because The Debtors
Have Not And Cannot Provide Fifth Street With Adequate Protection**

43.     In addition, relief from the stay should be granted for lack of adequate protection

of Fifth Street's first-priority perfected security interest in the Prepetition Collateral.  Section

362(d)(1) of the Bankruptcy Code provides for relief from the automatic stay under section

362(a) of the Bankruptcy Code, as follows:

> On request of a party in interest and after notice and a hearing, the
> court shall grant relief from the stay provided under subsection (a)
> of this section, such as by terminating, annulling, modifying, or
> conditioning such stay—
>
> (1)     for cause, including the lack of adequate protection of an
> interest in property of such party in interest.

11 U.S.C. § 362(d)(1) (emphasis added).

44.     The most common basis for granting relief from the automatic stay for "cause" is

a debtor's failure to afford adequate protection of a secured creditor's interest in its security.  3

Collier on Bankruptcy ¶ 362.07. While the list in section 362(d)(1) of the Bankruptcy Code is not exhaustive, the Bankruptcy Code explicitly included "lack of adequate protection" as constituting sufficient "cause" for granting relief from the automatic stay. See In re Eclair Bakery LTD., 255 B.R. 121, 137 (Bankr. S.D.N.Y. 2000). Thus, a debtor's inability to adequately protect a secured creditor is clearly sufficient grounds for relief from the automatic stay.

45. The requirement to provide adequate protection is mandatory,[9] a secured creditor is entitled to adequate protection – as a matter of right, not merely as a matter of discretion – when it is stayed from enforcing its interest, when the estate proposes to use, sell or lease property in which it has an interest. See Metromedia Fiber Network Servs. v. Lexent, Inc. (In re Metromedia Fiber Network, Inc.), 290 B.R. 487, 491 (Bankr. S.D.N.Y. 2003) ("Section 363(e) is not permissive or discretionary – it states that the court 'shall' grant the relief specified, at any time, on the request of secured entity."). If the debtor cannot demonstrate that a secured creditor's interest in collateral is adequately protected despite the debtor's continuing use of the collateral, the debtor cannot use the collateral. See 3 Collier on Bankruptcy, ¶ 363.05[2].

46. Adequate protection is "recognized as a fundamental right afforded secured creditors in bankruptcy proceedings." In re Waste Conversion Techs., Inc., 205 B.R. 1004, 1007 (D. Conn. 1997). The purpose of adequate protection "is to insure that a secured creditor receives the value for which the creditor bargained for prior to the debtor's bankruptcy." In re WorldCom, Inc., 304 B.R. 611, 618-19 (Bankr. S.D.N.Y. 2004) (citations omitted). The Bankruptcy Code "deliberately protects and preserves the interests of secured creditors in property in which they have a security interest, and accordingly takes the concept of adequate

---

[9]  Section 363(e) of the Bankruptcy Code provides that "the court, with or without a hearing, *shall prohibit* or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. §363(e) (emphasis added).

protection very seriously." Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp. (In re Blackwood Assocs., L.P.), 153 F.3d 61, 68 (2d Cir. 1998).

47.    In requiring debtors to provide secured creditors with adequate protection, the Bankruptcy Code was concerned with compensating secured creditors for the decrease in value of their interest in the collateral. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("the goal of adequate protection is to safeguard the secured creditors from diminution in the value of its interests during Chapter 11 reorganization."). In fact, the "common ground that 'the interest in property' referred to by § 362(d)(1) includes the right of a secured creditor to have the security payment applied in payment of the debt upon completion of the reorganization; and that interest is not adequately protected if the security is depreciating during the term of the stay." United State Assoc. of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 370 (1988).

48.    Adequate protection thus "must not be illusory and, particularly in the context of the use of cash collateral, must be of the most indubitable equivalence." In re Goode, 235 B.R. 584, 590 (Bankr. E.D. Tex 1999); see also In re Waste Conversion Technologies, Inc., 205 B.R. 1004, 1007 (D. Conn. 1997). In the case of cash, the standard is generally high because cash is a "precious commodity" which, once spent, is permanently removed from the lender's collateral and if left unprotected by the court is subject to rapid diminution by the debtor. Id.; see also In re Earth-Lite, Inc., 9 B.R. 440, 43 (Bankr. M.D. Fla. 1981)..

49.    It is well settled that the Debtors bear the burden of proof in proposing an adequate protection package to provide more than mere speculation regarding the protections being offered and must premise their relief on facts or projections that have evidentiary support. See, e.g., In re Mosello, 195 B.R. 277, 292 (Bankr. S.D.N.Y. 1996) (finding insufficient

evidence of adequate protection based on debtors projection of future transactions); In re First South Savings Association, 820 F.2d 700, 712 (5th Cir. 1987) (Court of Appeals rejected the debtors' proposed post-petition financing where "[t]he numbers (i.e., value, income) offered by those called by the debtor to testify were…based on assumption that are not supported in the record."); In re Wieseler, 45 B.R. 871, 876 (D.S.C. 1985) (rejecting debtor's proffer of a replacement lien in future crops, finding that the debtor "must go beyond simply estimating what they hope they can harvest and what they hope the market will bring for it").

50.     Furthermore, if a debtor is authorized to use a secured creditor's collateral, administrative expenses payable from such collateral may only be for services which are for the benefit of the secured creditor rather than the debtor or other creditors.  See In re Flagstaff Foodservice Corporation, 739 F.2d 73, 76 (2d Cir. 1984) ("Payment of administration expenses traditionally has been the responsibility of the debtor's estate, not its secured creditors.").

51.     The Debtors cannot provide adequate protection to Fifth Street sufficient to avoid relief from the automatic stay.  The Debtors have failed to provide the Court or Fifth Street with a supportable cash collateral budget, without which the Debtor cannot demonstrate that Fifth Street is being provided sufficient adequate protection.  It does not appear that the Debtors' projections take into account customer turnover resulting from the bankruptcy cases, especially due to the unique nature of the Debtors' business wherein certain customers may also be vendors.  The proposed cash collateral budget was filed by the Debtors on the first day and, despite repeated requests, the Debtors have failed to provide Fifth Street with any information or back-up other than for immediate cash needs.  Based upon the limited unsubstantiated information contained in the proposed budget provided by the Debtors, the proposed adequate protection is wholly inadequate and indicates that Fifth Street has a significant risk that the value

of its Prepetition Collateral will significantly decline. Similarly, by the Debtors' own admission, the Debtors continue to suffer amidst the economic downturn and "precipitous" decrease of sales, and have liquidity issues . See Schinik Affidavit, ¶ 21. Furthermore, the Debtors admit that there is no equity cushion for the Debtors to rely on. Id. at ¶¶ 16-20.

52.     Diminution of the Prepetition Collateral will be significant for a variety of reasons. Normal wear and tear will result in a decrease in the value of plants and equipment; inventory standing as Prepetition Collateral will be depleted by sales; cash and cash equivalents serving as Prepetition Collateral will be diminished by their use to fund the Debtors' operations or meet its financial obligations to creditors other than Fifth Street. Replacement liens on speculative accounts receivable cannot adequately protect Fifth Street for this significant, continuing, diminution.

53.     Fifth Street is receiving no protection, much less the adequate protection to which it is entitled as a result of the Debtors' use of cash collateral and the imposition of liens and claims pursuant to section 364(c) of the Bankruptcy Code. The Debtors have not provided Fifth Street with adequate protection of Fifth Street's interest in the Prepetition Collateral in the form of interim cash payments, another type of collateral, or the indubitable equivalent of its interest in its collateral. It is clear that the Debtors have not met their burden on the value of the Prepetition Collateral.

54.     Based on Fifth Street's lack of adequate protection, Fifth Street has a significant risk that the value of its Prepetition Collateral will significantly decline. Accordingly, "cause" exists to lift the automatic stay to allow Fifth Street to commence its UCC foreclosure auction.

**III.     The Debtors Cannot Adequately Protect Fifth Street**

55.     Notably, the Debtors have not even proposed to provide Fifth Street with the standard, customary, protections typically included in cash collateral orders. The inability of the

Debtors to provide any, much less customary, adequate protection reinforces the need for the these cases to be dismissed. For example, customary adequate protections would include, without limitation, the following that the Debtors simply cannot provide:

a. **Adequate Protection Payments.** Past due amounts owing to Fifth Street total several million dollars. The Debtors do not have sufficient liquidity to provide any meaningful payments in this regard.

b. **Use of Cash Collateral**. The Debtors' use of cash collateral should be in strict compliance with a detailed, line-item budget approved by Fifth Street and limited solely to the payment of operational expenditures Fifth Street agrees are necessary to avoid immediate and irreparable harm to the Prepetition Collateral. The Court should not permit any amounts to be paid to or for the benefit of Messrs. Krinsky and Schinik, including any management or consulting fees or salaries. The proposed budget set forth in the Cash Collateral Motion contains a line item entitled "Consulting Services" that specifically details tens of thousands of dollars that would be payable to Mr. Krinsky and, upon information and belief, the "Payroll…" line item contains tens of thousands of dollars payable to Mr. Schinik. Although the Debtors have agreed not to seek such payments on an interim basis pending a hearing on this Motion, upon information and belief, the Debtors intend to pursue the ability to make such payments. Moreover, to date, the Debtors have been unable to provide sufficient back-up with respect to the line items in their budget.

Similarly, immediately prior to the Petition Date, the Debtors provided $350,000 in retainers to certain professionals. These chapter 11 cases provide no benefit to Fifth Street or any of the Debtors' creditors. Accordingly, Fifth Street should not be required to fund any administrative expenses, including, without limitation, professional fees. In re Flagstaff, 739

F.2d at 76. Therefore, such professionals should be required to return these funds to CrownBrook Debco.

      c. **Acknowledgment of Liens and Indebtedness.** The Debtors have no good faith basis to imply that Fifth Street's liens are somehow invalid and that Fifth Street holds anything other than a first-priority secured lien on all of the Debtors' assets. Accordingly, the Debtors should acknowledge the validity and enforceability and amount of the Prepetition Secured Debt and the validity, extent, perfection and priority of Fifth Street's security interests and liens on Debtors' assets, each as of the Petition Date. However, in continued bad-faith, the Debtors refuse to do so.

      d. **Adequate Protection Obligations**. Fifth Street should be provided with replacement liens, superpriority claims and adequate protection payments which shall have priority over all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 552 or 726, including any liens or claims granted to any DIP Lender.

      e. **Restriction on Use of Proceeds**. No costs or administrative expenses should be imposed upon Fifth Street or any of the Prepetition Collateral pursuant to sections 105(a), 506(c) or 552 of the Bankruptcy Code or otherwise.

**IV. The Debtors Cannot Be Permitted To Use Cash Collateral Or Authorized To Obtain The Proposed DIP Financing Due To A Failure Of Adequate Protection**

      56. As acknowledged by the Debtors,[10] Fifth Street's cash collateral cannot be used and DIP financing approved without Fifth Street consent unless Fifth Street is provided adequate protection as required by sections 363(c)(2)(B) and (e) of the Bankruptcy Code. The burden is

---

[10] See Cash Collateral Motion, ¶ 21 ("…the Debtors acknowledge that the Secured Creditors may be entitled to adequate protection against any diminution if the value of their prepetition collateral.").

on the Debtors to show that Fifth Street's property interests in its cash collateral are adequately protected.  See 11 U.S.C. § 363(p)(1).

57.     As set forth above, contrary to the Debtors' assertion, the Debtors propose to run these cases on the backs of the Prepetition Collateral without providing sufficient adequate protection.  Notwithstanding weeks of negotiations among the Debtors and Fifth Street, and the Debtors unsupportable assertions to the contrary, the Debtors have still not provided for any go-forward adequate protection to package to Fifth Street.  Such adequate protection must be provided as a matter of law if either the Cash Collateral Motion and/or DIP Motion is to be granted.  [In addition, although it is unclear, as drafted, approval of the Cash Collateral Motion and DIP Motion could possibly have the effect of the imposition of priming liens in favor of the DIP Lender on all of the Debtors' assets, assets already subject to the prior liens in favor of Fifth Street, even though Fifth street cannot be provided with the adequate protection required under the Bankruptcy Code.  For example, the Debtors would continue to use Fifth Street's Prepetition Collateral to generate profits that could serve as collateral for the DIP Loan.]

**V.     The DIP Motion Must Be Denied Because The Debtors Cannot Satisfy Section 364 of the Bankruptcy Code**

58.     In order to obtain postepetition secured financing under section 364(d) of the Bankruptcy Code, a debtor bears the burden of demonstrating that (i) it is unable to obtain unsecured credit, (ii) the credit transaction is necessary to and in fact does preserve the assets of the estate, and (iii) the terms of the proposed financing are fair, reasonable and adequate.  See In re Ames Dep't Stores, Inc., 1115 B.R. 34, 37-40 (Bankr. S.D.N.Y. 1990); In re Aqua Assoc., 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987); see also 3 Collier on Bankruptcy ¶ 364.04[1] at 364-11 (15th ed. Rev. 1999).

59.     Proposed financing should not be approved when it is apparent that the purpose of the financing is to benefit a party other than the debtor.  Ames Dep't Stores, 115 B.R. at 39 (citing In re Crouse, 71 B.R. 544).  Nor is postpetition financing consistent with the requirements of section 364 of the Bankruptcy Code where it would "skew the conduct of the bankruptcy case" and "destroy the adversary process."  Id. at 38.  In this regard, postpetition financing should not be approved when it provides the lender with undue control over the debtor's business operation and is crafted to accommodate only the debtor's controlling equity interest holders.  See In re Tenney Village, 104 B.R. 562 (Bankr. D.NH. 1989) (The court denied the debtor's motion as the proposed financing "would pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specifically crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt.")

60.     Approval of the proposed DIP facility is premature.  The DIP documents have not yet been drafted for Fifth Street to review and the specific terms of the proposal provide that if they are not completed to the DIP lenders' satisfaction the Debtors will be automatically deemed in default.

61.     In addition, the proposed DIP facility is not fair, reasonable or adequate and thus fails to satisfy section 364 of the Bankruptcy Code.  First, this Court should not reward the very person who caused the "crisis" by permitting him to come to the "rescue".  As discussed above, but conspicuously not mentioned in the DIP Motion, Mr. Krinsky controls the Debtors, holding more than 50% of their membership interests.  Prior to the Petition Date, Mr. Krinsky, the Debtors' out of the money equity, used in excess of $850,000 of Fifth Street's cash collateral in this bankruptcy quest, including causing the Debtors' professionals to receive at least approximately $188,000 in prepetition fees and $350,000 in retainers for application to

postpetition fees, amounts representing in excess of 50% of the Debtors' available cash, plus using as much as $300,000 to pay an unsecured creditor holding his personal guarantee of obligations owing from the Debtors. Having deprived the Debtors of much of their available cash, cash collateral usage is now being sought and Mr. Krinsky is now "magnanimously" offering to provide DIP financing to the Debtors. The Court should not countenance such conduct.

62. In addition, there is no basis for an insider who is the Debtors' controlling equityholder to charge any fees, much less 3.5% of the proposed facility (which under the proposed budget is never intended to be drawn), plus the expenses of the DIP lender in providing the facility. DIP Motion, ¶¶ 21 J, K, AA.

63. Moreover, the DIP facility would significantly, impermissibly, alter the rights of Fifth Street. The overwhelming control of the proposed DIP lender over the budget, assets sales, contracts, etc., would leave the Debtors with few alternatives for restructuring without the consent of their out of the money equity holder David Krinsky. For example, in accordance with the negative covenants Mr. Krinsky seeks to impose, Mr. Krinsky would be provided with a veto right on all sales that he does not approve, "including the right to approve potential buyers" and there would be limitations on capital expenditures which are necessary for the continued operation of the business. DIP Motion, ¶ 21 X. If this level of control is granted, it is unlikely that the Debtors can conduct these cases in accordance with their fiduciary duties to all creditors and maximize value for the benefit of their creditors. Rather, the DIP facility is simply a mechanism to try to ensure that Mr. Krinsky will be the sole beneficiary of these cases.

64. Nor can the Debtors demonstrate that less expensive and less restrictive financing is unavailable to them. Upon information and belief, the Debtors did not seek alternative DIP

financing from third parties.  For example, the Debtors never requested that Fifth Street provide such financing.  Other than asserting that such financing is not available, the Debtors have provided no evidence of any steps that they took in this regard.  Upon information and belief, there is less expensive and less restrictive financing available if the Debtors had performed their diligence instead of engaging in self-dealing with Mr. Krinsky.

## RESERVATION OF RIGHTS

65.     Fifth Street expressly reserves its right to amend or supplement this Motion, to introduce evidence supporting this Motion at the hearing on the Motion, and to file additional and supplemental objections as Fifth Street deems advisable.  In addition, any order granting adequate protection to Fifth Street should state that such order is without prejudice to the request of the Fifth Street for any modification of, or further or different, adequate protection.

## NOTICE

66.     Notice of this Motion to Dismiss has been provided to the Office of the United States Trustee, counsel to the Debtors, and those parties entitled to notice in these chapter 11 cases.  In light of the nature of the relief requested, Fifth Street submits that no other or further notices need be provided.

## WAIVER OF MEMORANDUM OF LAW

67.     No previous motion for relief sought herein has been made to this or any other Court.  In accordance with Local Bankruptcy Rule 9013-1(b) for the Southern District of New York, no separate memorandum of law is necessary as all authorities relied on in support of this Motion are set forth herein.

WHEREFORE, Fifth Street respectfully requests that this Court enter an order granting the relief requested herein dismissing the Debtors' chapter 11 cases, or, alternatively, lifting the automatic stay to permit Fifth Street to foreclose on the assets, and denying the relief requested in the Cash Collateral Motion and DIP Motion and such other relief as may be just and proper.

Dated: New York, New York
October 19, 2010

WINSTON & STRAWN LLP

By: /s/ Carey D. Schreiber
Carey D. Schreiber
Alan Moskowitz
200 Park Avenue
New York, NY 10166
(212) 294-6700
cschreiber@winston.com
almoskowitz@winston.com

*Attorneys for Fifth Street Mezzanine Partners II., L.P. and Fifth Street Finance Corp.*

NY:1308733.7